THE CITY OF CHICAGO, Plaintiff-Appellant, *v.* LOUIS PRUS *et al.*,
Defendants-Appellees.

First District (5th Division) No. 82—1863

Opinion filed August 19, 1983.

Stanley Garber, Corporation Counsel, of Chicago (Jerome A. Siegan, Edmund Hatfield, and Philip L. Bronstein, Assistant Corporation Counsel, of counsel), for appellant.

John W. Lally, of Chicago, for appellees.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from an order finding unconstitutional an ordinance of the city of Chicago prohibiting the use of "For Sale" and "Sold" signs in designated residential areas of the city. Plaintiff contends that: (1) the trial court erred in ruling that it had the burden of proving that the ordinance is valid; and (2) the finding is against the manifest weight of the evidence.

In 1979, plaintiff filed seven two-count quasi-criminal complaints alleging that defendant violated a section of the Chicago Fair Housing Ordinance which provides in relevant part:

"In order to *** eliminate as far as legislatively permissible, all forms of discrimination and segregation in the field of housing, it shall be an unfair housing practice and unlawful for any owner, lessee, sub-lessee, assignee, managing agent, or other person, firm or corporation having the right to sell, rent, lease or sublease any housing accommodation, within the City of Chicago, or any agent of any of these, or any real estate broker licensed as such by the City of Chicago.

***

H. To construct, place, maintain or install a 'For Sale' sign or 'Sold' sign of any shape, size or form on premises located in

Residential Districts, zoned R1 through R8 under Chapter 194A of this Code." (Chicago, Ill., Municipal Code, ch. 198.7b, par. 4(h) (1973).)

Defendant moved to dismiss the complaints on the ground that the ordinance impermissibly infringed upon his right of free speech guaranteed by the first amendment of the United States Constitution (U.S. Const., amend. I) and protected from invasion by State action under the fourteenth amendment (U.S. Const., amend. XIV; *Bigelow v. Virginia* (1975), 421 U.S. 809, 811, 44 L. Ed. 2d 600, 605, 95 S. Ct. 2222, 2227). The trial court, relying principally on *Daugherty v. City of East Point* (N.D. Ga. 1978), 447 F. Supp. 290, rejected plaintiff's offer of proof that Chicago suffers from instability as a result of rapid racial change in its neighborhoods; that such transition is caused in part by tactics such as "For Sale" signs; and that the ordinance in question helps promote the continued viability of stable, racially integrated neighborhoods. In effect, by granting defendant's motion to dismiss, the trial court held that the ban on "For Sale" signs was unconstitutional as a matter of law. We reversed and remanded the action for an evidentiary hearing (*City of Chicago v. Prus* (1981), 99 Ill. App. 3d 473, 425 N.E.2d 426), stating that, under *Linmark Associates, Inc. v. Township of Willingboro* (1977), 431 U.S. 85, 52 L. Ed. 2d 155, 97 S. Ct. 1614, plaintiff must be afforded an opportunity "to show that the purported harm caused by the posting of 'For Sale' signs could not be avoided by any means other than an ordinance banning them." (99 Ill. App. 3d 473, 476, 425 N.E.2d 426, 428.) We expressed no opinion therein on the constitutionality of the challenged ordinance, nor did we specify the proof necessary to establish the governmental interest involved; however, we noted that "only an emergency situation threatening a sudden and perhaps wrenching change in a neighborhood could justify derogation from protected commercial speech by means of a ban ordinance" (99 Ill. App. 3d 473, 477, 425 N.E.2d 426, 429), and that such determinations must be made on a case-by-case basis.

On remand, a hearing was held at which Ed Marciniak, an urbanologist, testified for plaintiff that he was executive director of the Chicago Commission on Human Relations from 1960 to 1968, and deputy commissioner of the city's Department of Planning from 1968 to 1972. From 1964 to 1967 the commission received 59 complaints which he or a commission staff member investigated. He did not specify the subject matter of the complaints, nor did he indicate the number which were determined to be without foundation after investigation. However, where there was a basis for the complaint, he would

find numerous "For Sale" signs in the area. During 1964, he had several occasions to view the southeast side of Chicago in his capacity as director of the commission, and noted signs of racial violence and a rapid, radical change in the racial composition of neighborhoods in that area. He defined "panic peddling" as an effort to frighten homeowners into selling in an area which may be undergoing racial or ethnic change. The practice usually involves real estate brokers who create fear or exploit prejudices to obtain property listings. Homeowners are sometimes induced to sell to the broker at less than market value, and the broker then resells the home for more than its market value. Panic peddlers use a variety of techniques, including door-to-door solicitation; dissemination of literature stating that a member of a minority group has purchased a home nearby; racial steering; telephone solicitations; obtaining numerous listings, then placing signs to frighten other residents of the area into selling; "wrong number" phone calls in which the caller indicates that he thought he was calling "the black family that just moved in"; purchasing a home in the area and selling it on contract to a minority buyer; telling owners that the FHA had inspected certain property, implying that it would be sold to a black or Hispanic, that the police could no longer patrol the area effectively, and that the influx of minorities would affect the schools.

Marciniak further testified that between 1950 and 1970, panic peddling was taking place primarily in the southwestern, southeastern and eastern portions of the city, and arose because of the dual housing market. The white and minority populations were served by different brokers, and houses in one market would not be shown to persons served by the other market. In this way, those who controlled the white real estate market were able to confine the movement of minority groups to areas adjoining existing minority communities rather than allowing movement throughout the city and suburbs. This dual market was able to maintain itself through connections between the real estate industry and the insurance and mortgage industries; prospective minority buyers would find that they could not obtain the necessary mortgage or insurance to purchase a home in a "white" area. During this time, the minority population was increasing, and brokers serving that population had to "open up" new areas, that is, transfer properties from the white real estate market to the minority market. Marciniak stated that had there been effective tools at that time to open the entire market to all persons, there would not have been the massive racial transition in concentrated areas that characterized the period. However, because of existing conditions, brokers

serving the minority market practiced panic-peddling techniques in order to obtain listings in predominantly white areas adjoining minority neighborhoods. As a result of the activities of brokers who specialized in areas undergoing racial and ethnic change, community organizations were formed which attempted to stabilize the situation.

According to Marciniak's testimony, "For Sale" and "Sold" signs have two purposes: commercial advertisement and informing white homeowners that a broker serving the minority market is operating in the area. Such signs are an important tool of panic peddling, and were used extensively, for example, in the Austin area from 1960 to 1970. The ordinance in question was needed when first passed in November 1971, and appears to have been effective because instances of panic peddling have declined since 1970, and there has been a significant slowing of massive racial transitions. Marciniak admitted that the use of signs is only a problem in predominantly white areas adjacent to predominantly minority communities, and that a single sign or a few signs in an otherwise stable community will not of themselves cause a sudden change—it is their use in conjunction with other techniques that causes panic in an area near a minority neighborhood. Marciniak also stated that in the past several years "For Sale" signs had begun to appear again, and he had heard that, in some areas, there was a proliferation of them, and there is one area of the city that has been going through a rapid change since 1977. In his opinion, the ban on signs would be necessary even if other sections of the Chicago Fair Housing Ordinance were strictly enforced. He further indicated that a sudden, wrenching change may be caused by an increase in arson, door-to-door solicitation, moving minority families into predominantly white communities, the use of "For Sale" signs by a broker known to be a panic peddler, or a major depression. Currently, these factors operate collectively to cause change, but, in Marciniak's opinion, any one factor alone could have the same result.

Jeanine Stump, a member of the Northwest Austin Council, testified that the organization was founded in 1967 as part of a community effort to stabilize the area. There were many homes for sale at that time, and there were as many as 10 "For Sale" signs in a single block of 40 homes. In addition to the signs, residents were the object of intensive solicitation by brokers both in person and by phone or mail. Some solicitation letters might say "Don't get caught over a barrel. Sell your home now," while others listed all the homes for sale or recently sold in the area. The organization members went out into the neighborhood and talked to residents, trying to calm their fears, but many felt that the "white flight" could not be stemmed. Brokers

were asked to take their signs down and cease their mass solicitations, but they refused. The organization then joined with other community groups in asking the city to institute a ban on signs; once the ordinance went into effect, the panic subsided and the change had become more gradual. Ms. Stump further stated that although the brokers were using all of the panic-peddling techniques during this time, the mass solicitation stopped about the time that the ban went into effect; that efforts of the organization had stabilized the area and there had been no sudden changes, although a few signs had recently appeared; and that when such signs had been placed, members of the organization had notified the police of the ordinance violation and the signs had been removed.

James Keck testified that he purchased a home in 1951 for $16,800, but sold it in 1969 for $14,500 when he thought the neighborhood was going to change; that he had been contacted through the mail, by phone, and in person by a number of brokers; that there were many "For Sale" signs in the area, perhaps one or two per block, for six months before he sold; and that the signs frightened him because he thought the area was going to change overnight. He further stated that the decisive factor in selling his home was the fact that his children were being harassed by some minority-group children who had moved into the area.

Marie Maher testified that she lived in the North Austin area for 56 years and was a member of the Northeast Austin Organization founded in 1971 to help stabilize the area. In 1970, "For Sale" signs began appearing in the area, as many as six per block. In conjunction with this, brokers were soliciting by mail, by phone, and in person, urging residents to sell "before they lost money." She further stated that the solicitation and signs were disrupting the community and that the ban on signs helped ease residents' fears, although solicitation was also curtailed at the same time. She also testified that the other panic-peddling tactics would have had the same unsettling effect on the community even in the absence of "For Sale" signs.

Charles Shanabruch, executive director of the Beverly Area Planning Association, testified that the association works with area realtors to prevent resegregation of the neighborhood and promote affirmative marketing. The organization opposes the use of "For Sale" signs because they have a destabilizing effect on a neighborhood. They also try to prevent the operation of realtors who engage in panic-peddling tactics such as solicitation and racial steering. When a panic peddler begins operating in the area, the organization reports the solicitation tactics to the city and holds community meetings to

counteract the effects. Shanabruch stated that in the past three years, two signs were placed in the area, and the resident and realtor involved cooperated when asked to remove them. He also stated that although a combination of panic techniques is needed to cause a sudden, wrenching change in an area, it was nonetheless his opinion that signs alone could cause a gradual resegregation of an integrated community.

Frank Tobin testified that he served as a priest in a parish near 99th and Jeffrey in the late 1960's and early 1970's. In 1968 the surrounding area was a relatively stable, predominantly white community, but by 1972 it was 80-85% black. He stated the change began in 1968-69 when "For Sale" signs began appearing, and the number of real estate agencies in the area increased from three or four to 40 or 50. Residents of the area were receiving two or three calls a day from realtors soliciting real estate listings, as well as door-to-door and mail solicitations. It was Tobin's opinion that all of these factors disrupted the community, instilling fear and panic. Tobin also indicated that because of their high visibility, signs were a significant factor in creating panic, and it might have been easier to control the situation if signs were banned. He further acknowledged the fact that although it is a combination of factors which cause a rapid change, including signs, solicitation, rumors, and the condition of the community and the economy, a proliferation of signs probably would not cause panic in a neighborhood that was not in the process of change.

Shirley Reed testified that an agent from Easy Life Real Estate attempted to solicit a listing on her grandfather's home in Wicker Park in 1979 by making numerous telephone calls and telling him that blacks were moving into the area. She stated that in 1979 Wicker Park was predominantly black and Puerto Rican, but more white families had moved into the area recently. She also testified that although there were "For Sale" signs in the area, they would not have induced her grandfather to sell in the absence of the other panic tactics, and that she put an end to the calls by telling the agent that she owned the property and would not sell and that he should cease his solicitation.

Mary Frances Gast testified that she had lived in the Beverly-Morgan Park area since 1963. She further stated that she became very concerned about the stability of the area when as many as four "For Sale" signs appeared in block after block, and "was glad to see a ban on such signs." Ms. Gast also testified that as a real estate agent she felt that the ban had not harmed the industry; in fact, it was her opinion that it had helped business because prospective pur-

chasers now had to consult brokers to find out what was available. She further admitted that her agency uses signs in communities where they are permitted and that they can be a useful selling device; however, because of the situation in the city, *i.e.*, rapidly changing areas, Ms. Gast stated that signs do a great deal of harm to homeowners and property values. She could not name any area of the city that was currently undergoing a rapid racial change, but indicated that the suburbs of Bellwood and Country Club Hills were changing, although the process had slowed since the time each community enacted a ban on "For Sale" signs. She also stated that notwithstanding the fact that the signs were banned in Country Club Hills five years ago, the area was still changing.

Rose Clementi testified that she sold her home at 57th and Aberdeen for a substantial loss after a broker told her that if she did not sell immediately she would not be able to sell, and that many homes in the area had been sold already. He also mentioned the numerous signs in the area. Ms. Clementi further stated that she had no thoughts of selling, despite having seen the signs, until the broker approached and told her that blacks were moving into the neighborhood.

Sharon Schingoethe, a real estate broker who lives in the Northtown area, testified that one of the best methods for a realtor to get listings is to put up "For Sale" and "Sold" signs to make residents aware that he is selling in the area. She also stated that in the last few years prior to trial there had been a proliferation of signs in the Northtown and Edgewater areas, and there would be even more if the city did not enforce the ordinance and force people to remove them. It was her opinion that "For Sale" signs have a detrimental impact on the community because they create instability and panic in areas that are either in the process of change or near changing areas. She admitted that her agency used a sign in a changing area, at the insistence of the owner, after the initial trial court decision declared the ordinance unconstitutional; however, they removed the sign after one month because area residents complained and because children kept knocking the sign down. Two other signs were placed in the area at about the same time, but to her knowledge none of the buildings were sold and she did not know whether the signs caused a sudden, wrenching change in the neighborhood. Ms. Schingoethe also testified that in the two months prior to trial, 12 signs had appeared in a two-square-block area near her home. She further stated that in 1975 the area was predominantly white, but by 1977 the white population had decreased and the minority population had grown. She believed the change was caused by fears that the area would change, by older peo-

ple wanting to sell after their children were grown, and by the fact that there is now less discrimination in selling. It was her further opinion that Wicker Park, which was predominantly black in 1979 when "For Sale" signs began appearing had also changed, as evidenced by a large exodus of blacks from the area as brokers bought buildings, renovated them, and sold them to white families. It was her belief, however, that the renovation had improved the area.

Joseph Battaglia testified that he worked for the Commission on Human Relations in 1979. He stated that the commission received complaints about "For Sale" signs during a meeting of the Wicker Park Neighborhood Council. Although people at the meeting said the signs were causing panic in the neighborhood, he did not speak to any individual who claimed to be afraid of a change in the neighborhood because of the signs. He further testified that the signs in question were placed by Easy Life Real Estate Co., that he contacted Louis Prus about the complaints, informing him that they violated the ordinance, and that Prus refused to remove them.

Willie Granderson testified that he was the director of fair housing in the city's Department of Housing. He worked as an investigator from 1968 to 1972, receiving and investigating complaints about violations of the Chicago Fair Housing Ordinance which prohibits discrimination in housing, panic peddling, block-busting, and "For Sale" signs. He stated that in 1968 he investigated complaints alleging panic-peddling in Austin, West Englewood, South Shore, and Roseland. During the years 1968-71, he observed numerous "For Sale" signs in those areas, as many as three or four per block, and that real estate offices opened in the area and created panic by solicitation, block-peddling and signs. It was his opinion that the signs speeded the spread of panic in the area and caused rapid racial change. He also testified that he visited the same areas after the ordinance was enacted and noted that the rapid change had slowed and some areas had stabilized; North Austin is now a stable, integrated community. Granderson further stated that, in the above areas, the rapid change was caused by heavy solicitation, panic-peddling and signs, all of which violate the Chicago Fair Housing Ordinance. He indicated, however, that although the ordinance is also intended to ensure that sellers and lessors do not discriminate, signs can legitimately be used to notify all prospective purchasers that property is for sale, notwithstanding the fact that the use of signs may sometimes result in uprooting a community. He also stated that from June 25, 1980, when the trial court first ruled that the ordinance was unconstitutional, until May 22, 1981, when that decision was reversed and remanded, the city did not

enforce the ordinance, and "For Sale" signs appeared in many areas. He also acknowledged that, during those 11 months, no area underwent a sudden change, explaining that the various real estate boards cooperated with the city and did not place signs in areas adjacent to minority communities where they might cause panic.

Three residents of the Wicker Park area testified for defendant that they purchased their homes after seeing defendant's signs advertising the availability of the property. Before that time, they had not contemplated buying, and had not consulted a broker or looked at newspaper advertisements. All three residents were of the opinion that although there were "For Sale" signs in the area, they were not causing panic, nor was the area undergoing rapid racial change.

Ann Kenis testified for defendant that she has lived near Howard and Western for five years and, in the two months prior to trial, "For Sale" signs had appeared in the area, as many as six or seven signs in a four-block area. She stated that the signs had not caused a sudden change in the demographics of the area and that she did not feel that they had had an adverse effect on her property.

Anita Rest, a real estate broker, testified that she had been active in the Wicker Park area for the past seven years and, since 1975, there had been a gradual change in the area; younger people were moving in and rehabilitating the area, causing a rise in property values. Although there were "For Sale" signs in the area, Ms. Rest stated that they had not caused panic or a mass exodus of a particular racial or ethnic group. She further stated that she was not a broker in 1968-71 and did not know what effect signs had then in conjunction with panic-peddling in various areas of the city.

Albert Weinberg, a real estate broker who was active in the Lawndale, Garfield Park and Austin areas from 1948 to 1966 when they were undergoing racial change, testified for defendant. He stated that in 1948 Lawndale had an all-white population, but the people there were older. By 1968, the area was 95% black. It was his opinion that the change occurred because younger people were moving to the suburbs and there was no market for the homes of older people who wanted to sell because their families were grown. At the same time, the minority population of the city was increasing, and Lawndale was an attractive area in which they could obtain housing at fairly low prices. As a result, by 1959 the community was 60% black and many businesses began leaving the area. Weinberg believed that panic was caused by brokers who went door-to-door and urged owners to sell because minorities were buying in the area. Residents would receive calls in the middle of the night threatening their fami-

lies if they did not sell. Some brokers bought homes in previously all-white areas and moved minority families in to create panic. According to Weinberg, signs were a minor factor in comparison to these other tactics; they were only effective after a block was 75-80% changed and served to panic the remainder of the residents into selling. He also stated that during this time the Roosevelt Road Businessmen's Association was formed to try to stabilize the area and convince businesses to remain. The organization tried without success to convince those engaged in panic peddling to cease their activities. Weinberg further testified that all of this took place before the Fair Housing Ordinance was enacted in 1963; had the ordinance been in effect, it would have enabled them to put a stop to the personal contacts and racist literature, since it is the ban of scare tactics and solicitation techniques rather than the ban on "For Sale" signs that prevents panic. It was also his opinion that the prohibition on signs would not stop panic peddling because signs appear only after fears have been aroused and the racial change is almost complete; instead, Weinberg believed that vigorous enforcement of other provisions of the Fair Housing Ordinance as well as of the building code would eliminate most panic peddling.

Weinburg also acknowledged that the socio-economic factors which contributed to the rapid change in neighborhoods during the 1950's and 1960's exist today in certain areas, for example, Albany Park and Austin. In Albany Park, the change has been gradual despite the existence of "For Sale" signs because there had been no panic peddling. Austin is still in the process of transition, but the prohibition of "For Sale" signs has not slowed the pace of change. Similarly, in West Rogers Park, where Weinburg resides, no sudden change had occurred in the area despite the increasing use of "For Sale" signs during the year and a half prior to trial; the signs had had no effect on the value of his property. In his opinion, signs are an excellent tool for selling property; 90% of vacant lots are sold by placing a sign on them.

Joseph Battaglia, recalled by defendant as an adverse witness, testified that in 1979 there were areas of the city undergoing a rapid racial change. Wicker Park was one of those areas, but Battaglia would not have called the change "wrenching" because the community was becoming integrated. He further stated that although "For Sale" signs were used after the ordinance was declared unconstitutional, they did not cause any sudden and wrenching change because brokers were cooperating with local community groups when contacted and asked to remove the signs. Battaglia kept a long list of properties on which signs had been placed during the four months be-

fore trial, but he was not aware of any area that had undergone a sudden and wrenching change during that time. It was his opinion that even if the ban on signs is declared unconstitutional, brokers can be prosecuted under existing laws for pandering to racism.

Ben Rosenthal, a real estate broker, testified for defendant that South Austin changed from 1975 to 1980 from a predominantly white to a predominantly black community despite the ban on "For Sale" signs and that the change had been a continuous process rather than sudden and wrenching. He also stated that North Austin was undergoing the same type of change, but at a more gradual pace, despite the fact that "For Sale" signs were being used in the area and, in his opinion, the use of signs was not contributing to the racial change. Rosenthal further stated that he lived in the South Shore area, a neighborhood that changed from predominantly white to predominantly black between 1959 and 1968. Although there were many "For Sale" signs in the area at that time, he believed they were only effective in combination with other factors. He also stated that the community had been relatively stable since 1972, but there had been a great deal of recent renovation, property values were increasing, and the area was gradually becoming integrated. In his opinion, the prohibition on signs may contribute to racial segregation. Rosenthal further testified that in North Austin, the community organizations are controlled by white residents and they actively discourage the use of signs and listing with brokers; that because of pressures from these organizations and individual residents, brokers are not showing properties north of North Avenue to prospective minority purchasers; and that such steering would not be possible if signs were used.

In summation, Rosenthal stated that brokers and homeowners have used signs on a select basis, but the market has remained stable and no neighborhood has undergone rapid change since the city stopped enforcing the ordinance. In addition, although there was a lot of panic peddling in the 1950's and 1960's, he stated that brokers had become more cautious since then, due principally to the pressures of community organizations and forces within the real estate industry itself. Rosenthal also acknowledged that there are alternatives to "For Sale" signs, and, while the ban was in effect, realtors used multiple listings and newspaper advertisements; however, in some areas and for some types of property, those methods of advertising were not as effective as signs.

The trial court found that 59 complaints were received from the entire city from 1964 to 1967, but there was very little evidence of written complaints from 1968 to November 1971, the date the ban on

"For Sale" signs was passed. Other portions of the Fair Housing Ordinance were enacted in 1963, but there was no evidence that plaintiff attempted to enforce those provisions from 1964 to 1971. The court further noted that panic peddling involves numerous techniques which are prohibited by the Fair Housing Ordinance, and that "For Sale" signs are part of a general pattern of panic selling rather than an independent cause of sudden and wrenching changes. The evidence further established that signs were currently being used in various neighborhoods of the city, but there was no evidence that these neighborhoods had become unstable; in fact, Wicker Park, the area in which the violations in question occurred, has become a stabilized, rehabilitated community. In the light of this evidence, the trial court found that plaintiff had not met its burden of proving by a clear preponderance of the evidence that the city was undergoing a sudden, wrenching change and held that the ordinance in question is an impermissible infringement on defendant's right of free speech. Defendant was found not guilty, and this appeal followed.

Opinion

■ Before reaching the merits of this appeal, we first must address defendant's contention that the appeal should be dismissed because he was found not guilty and further prosecution of him is therefore barred by the constitutional prohibition against double jeopardy. This argument assumes the applicability of Supreme Court Rule 604 (87 Ill. 2d R. 604) governing the decisions which the State may appeal in criminal prosecutions. However, although a prosecution for violation of a municipal ordinance is quasi-criminal in character, it is civil in form (*City of Danville v. Hartshorn* (1973), 53 Ill. 2d 399, 292 N.E.2d 382), and the rules of civil procedure generally govern at trial and on appeal (*Village of Arlington Heights v. Suchocki* (1980), 89 Ill. App. 3d 985, 412 N.E.2d 561). It is established that, at least where, as here, the sole penalty for violation of the ordinance is a fine (Chicago, Ill., Municipal Code, ch. 198.7B, par. 12 (1982)), Supreme Court Rule 604 is inapplicable, and the municipality may appeal as in any civil case without violating the prohibition against placing a defendant twice in jeopardy for the same offense (*Village of Park Forest v. Bragg* (1967), 38 Ill. 2d 225, 230 N.E.2d 868; *Village of Maywood v. Houston* (1956), 10 Ill. 2d 117, 139 N.E.2d 233).

■ Defendant's further argument, without citation to authority, that plaintiff's request for outright reversal in its brief, rather than reversal and remandment, is somehow fatal to its right to appeal is similarly without merit. Should we find that the trial court's decision

must be reversed, we have the power to remand the action for further proceedings pursuant to Supreme Court Rule 366 (87 Ill. 2d R. 366), and we are in no way bound by the relief which appellant might prefer. Moreover, we do not agree, as defendant contends, that plaintiff is asking us "to act as judge and jury"; defendant stipulated below that he installed the signs in question, that the signs were within residential districts zoned R1 through R8, and that he did not remove the signs after notification of the violation. As the trial court noted, if the ordinance is constitutional, the above stipulations establish defendant's guilt. Since the relevant facts are undisputed, further trial of this issue would be unnecessary and the only task of the trial court on remand would be determination of the fine to be imposed.

■ Turning to the merits of this appeal, we note preliminarily that recent decisions involving governmental restraints on commercial speech have reaffirmed that it is afforded a lesser degree of protection than other forms of expression (see, *e.g., Bolger v. Youngs Drug Products Corp.* (1983), 463 U.S. ___, 77 L. Ed. 2d 469, 103 S. Ct. 2875), and those decisions have further refined the four-part analysis applicable to commercial speech cases first announced in *Central Hudson Gas & Electric Corp. v. Public Service Com.* (1980), 447 U.S. 557, 566, 65 L. Ed. 2d 341, 351, 100 S. Ct. 2343, 2351, which stated:

"At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

In the instant case, there is no dispute, and *Linmark Associates, Inc. v. Township of Willingboro* (1977), 431 U.S. 85, 52 L. Ed. 2d 155, 97 S. Ct. 1614, clearly establishes that there is nothing unlawful about selling a home, nor is the simple announcement of that fact misleading, and that the State and its subdivisions have a substantial interest in promoting stable, racially integrated housing. However, the language in *Linmark* and subsequent citations thereto seem to go further and leave considerable doubt whether even a substantial interest is sufficient justification for restricting the information conveyed by "For Sale" signs. In *Linmark*, the court clearly relied on the fact that the evidence presented did not establish any direct relationship between a ban on "For Sale" signs and a lessening of the incidence of

panic selling, that is, that the law was necessary to achieve the stated objective. It went on to note:

"The constitutional defect in this ordinance, however, is far more basic. The Township Council here, like the Virginia Assembly in *Virginia Pharmacy Bd.*, acted to prevent its residents from obtaining certain information. That information, which pertains to sales activity in Willingboro, is of vital interest to Willingboro residents, since it may bear on one of the most important decisions they have a right to make: where to live and raise their families. The Council has sought to restrict the free flow of these data because it fears that otherwise homeowners will make decisions inimical to what the Council views as the homeowners' self-interest and the corporate interest of the township: they will choose to leave town. The Council's concern, then, was not with any commercial aspect of 'For Sale' signs—with offerors communicating offers to offerees—but with the substance of the information communicated to Willingboro citizens. If dissemination of this information can be restricted, then every locality in the country can suppress any facts that reflect poorly on the locality, so long as a plausible claim can be made that disclosure would cause the recipients of the information to act 'irrationally.' *Virginia Pharmacy Bd.* denied government such sweeping powers. As we said there in rejecting Virginia's claim that the only way it could enable its citizens to find their self-interest was to deny them information that is neither false nor misleading:

'There is . . . an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them . . . . But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. 425 U.S., at 770.'

Or as Mr. Justice Brandeis put it: 'If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression.' *Whitney v. California,* 274 U.S. 357, 377 (1927) (con-

curring opinion)." 431 U.S. 85, 96-97, 52 L. Ed. 2d 155, 164-65, 97 S. Ct. 1614, 1620.

Based on this language, we held in *City of Chicago v. Prus* (1981), 99 Ill. App. 3d 473, 425 N.E.2d 426, that only the existence of an emergency situation would justify the use of a ban, that is, where the situation is such that the alternative remedy of public education and discussion is not viable. Our view is reinforced by the recent Supreme Court decision in *Bolger v. Youngs Drug Products Corp.* (June 21, 1983), 51 U.S.L.W. 4961, wherein the court affirmed a finding that the United States Postal Service's ban on the unsolicited mailing of advertisements for contraceptive devices is unconstitutional. The court noted that the regulation denied parents truthful information bearing on their ability to discuss birth control and to make informed decisions on what information they might wish to impart to their children. Citing *Linmark*, the court held that "[b]ecause the proscribed information 'may bear on one of the most important decisions' parents have a right to make, the restriction of 'the free flow of truthful information' constitutes a 'basic' constitutional defect regardless of the strength of the government's interest." (51 U.S.L.W. 4961, 4965.) The above language appears to afford almost full constitutional protection to "For Sale" signs, requiring even stricter scrutiny than seems to be necessary under the *Central Hudson* test. This interpretation is further advanced by Justice Blackmun's explanation of *Linmark* in *Central Hudson*. After citing the above passage from *Linmark*, he noted that the decision therein "resolved beyond all doubt that a strict standard of review applies to suppression of commercial information, where the purpose of the restraint is to influence behavior by depriving citizens of information." (447 U.S. 557, 577, 65 L. Ed. 2d 341, 358, 100 S. Ct. 2343, 2357 (Blackmun, J., concurring).) With these standards in mind, we must consider three questions: whether the evidence establishes a direct relationship between the ban on "For Sale" signs and the governmental interest in promoting stable, racially integrated housing; whether the ordinance is broader than necessary to accomplish that objective; and whether, even if the above elements are established, plaintiff has further shown that an emergency situation exists which makes the alternative recognized in *Linmark* inadequate.

■ Initially, plaintiff contends that the trial court erred in placing on it the burden of proving the facts necessary to justify its ban on "For Sale" signs. It argues that an ordinance, like a statute, is presumptively valid, and the party challenging its constitutionality has the burden of proving its invalidity by clear and convincing evidence,

citing *Schuringa v. City of Chicago* (1964), 30 Ill. 2d 504, 198 N.E.2d 326, and *Greyhound Lines, Inc. v. City of Chicago* (1974), 24 Ill. App. 3d 718, 321 N.E.2d 293. However, these cases involved challenges to the municipality's exercise of its police powers, and alleged that the ordinance in question was arbitrary and unreasonable since it bore no reasonable relationship to the public health, safety or welfare. When faced with such challenges, we are willing to defer to the legislative determination of what best serves the public; but where the challenge involves a violation of first amendment guarantees, the burden is on the governmental entity to justify its restrictions. (See, *e.g., Bates v. State Bar of Arizona* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691.) Some courts have gone so far as to hold that a regulation which restricts the exercise of first amendment freedoms is presumptively *invalid* (*International Society for Krishna Consciousness, Inc. v. Rochford* (7th Cir. 1978), 585 F.2d 263); at the very least, where an ordinance or regulation arguably impinges upon first amendment rights, it is for the enacting body to justify it (*Bayou Landing, Ltd. v. Watts* (5th Cir. 1977), 563 F.2d 1172, 1175, *cert. denied* (1978), 439 U.S. 818, 58 L. Ed. 2d 109, 99 S. Ct. 79, citing *Linmark*). Therefore, to the extent that the trial court's determination is dependent upon a resolution of factual conflicts, the burden is on plaintiff, and the trial court's findings will not be disturbed unless contrary to the manifest weight of the evidence.

█ With regard to the question whether an ordinance directly advances the stated governmental interest, *Central Hudson* indicates that an ordinance may not be sustained "if it provides only ineffective or remote support for the government's purpose." (447 U.S. 557, 564, 65 L. Ed. 2d 341, 350, 100 S. Ct. 2343, 2350.) We note that, in *Metromedia, Inc. v. San Diego* (1981), 453 U.S. 490, 69 L. Ed. 2d 800, 101 S. Ct. 2882, the Supreme Court stated that, even in the absence of proof on this issue, common sense may dictate in some situations that a relationship exists. There, the plaintiff challenged an ordinance regulating outdoor advertising displays, and the city argued that the regulations served the substantial governmental interest in improving traffic safety and the appearance of the city. The court noted the meager evidence of any connection between billboards and traffic safety, but stated that it "hesitate[d] to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety. There is nothing here to suggest that these judgments are unreasonable." (453 U.S. 490, 509, 69 L. Ed. 2d 800, 816, 101 S. Ct. 2882, 2893.) In *Oklahoma Telecasters Association v. Crisp* (10th Cir.

472

1983), 699 F.2d 490, 501, the court relied on this language of *Metromedia* in holding that, despite the lack of evidence on the issue, the ban on advertising alcoholic beverages directly advanced the State's interest in reducing the sale and consumption of such beverages, noting that "[t]he entire economy of the industries that bring these challenges is based on the belief that advertising increases sales. We therefore do not believe that it is constitutionally unreasonable for the State of Oklahoma to believe that advertising will not only increase sales of particular brands of alcoholic beverages but also of alcoholic beverages generally." Similarly, here, plaintiff argues that common sense dictates that the proliferation of "For Sale" signs will cause panic selling. However, the Supreme Court clearly rejected this argument in *Linmark*, where it noted that "the record does not confirm the township's assumption that proscribing such signs will reduce public awareness of realty sales and thereby decrease public concern over selling." (431 U.S. 85, 95-96, 52 L. Ed. 2d 155, 164, 97 S. Ct. 1614, 1620.) It went on to note:

> "While this assumption is certainly plausible, it is also possible that eliminating signs will cause homeowners to turn to other sources for information, so that their awareness of—and concern over—selling will be unaffected. Indeed, banning signs actually may fuel public anxiety over sales activity by increasing homeowners' dependence on rumor and surmise. ***
>
> The fact that sales volume remained unchanged in Willingboro in the first nine months after the ordinance was enacted suggests that it did not affect public concern over selling, if that concern was a significant cause of housing turnover." (431 U.S. 85, 96 n.10, 52 L. Ed. 2d 155, 164 n.10, 97 S. Ct. 1614, 1620 n.10.)

It appears, then, that plaintiff may not rely upon any assumptions; it must prove that the ordinance directly affects its interest in promoting stable, racially integrated neighborhoods.

Here, an urbanologist testified that the use of "For Sale" signs has always been a part of a general pattern of panic-peddling techniques and that the signs alone can cause panic in an area near a minority neighborhood, but he presented no statistical data or examples to support this conclusion, and acknowledged that he knew of no situation where this had occurred. Several witnesses for plaintiff agreed that signs alone will not cause rapid racial changes; it is their use in connection with mass solicitation, rumors, and other tactics which cause panic. Other witnesses admitted that the number of "For Sale" signs in a given area had no bearing on their decision whether or not

to sell: James Keck sold because of perceived threats to his children's safety; Rose Clementi had seen numerous signs, but had no thoughts of selling until a broker approached her and told her that blacks were moving into the area and she soon would be unable to sell; Shirley Reed testified that her grandfather's decision to sell was not influenced by the "For Sale" signs evident in the Wicker Park area, but by improper solicitation tactics.

Several witnesses further testified that the incidence of massive racial transitions had slowed since 1970, although no data was provided to support these conclusions, and attributed this phenomenon to the ban on "For Sale" signs. However, witnesses from several community organizations, testifying for plaintiff, stated that the ban on "For Sale" signs coincided with the cessation of mass solicitation techniques in their neighborhoods and the formation of community organizations established to educate the community and counteract the effects of panic peddling. These organizations currently hold neighborhood meetings, work closely with realtors in their efforts to prevent all forms of panic peddling, and report violations of other provisions of the Fair Housing Ordinance. These are precisely the channels mandated by the Supreme Court as a viable alternative to repression of information—public awareness and education. Moreover, although the witnesses in question attributed the change in the speed of transition to the ban on signs, there was no testimony which could separate this particular event from the other influences taking place at the same time. We could as well find from this evidence that the change was solely attributable to the cessation of other tactics or to the formation of community organizations.

Furthermore, it appears from the evidence that rapid racial changes have continued to occur despite the ban on "For Sale" signs, casting doubt on the efficacy of that measure. Ed Marciniak testified that one unnamed area of the city has been going through a rapid racial change since 1977, some three years before the initial trial court decision declaring the ordinance unconstitutional. He did not testify that the 1980 finding that the ordinance was unconstitutional had any effect on the rate of change in that area. Similarly, Sharon Schingoethe, a real estate broker, testified that racial changes occurred in Northtown between 1975 and 1977, while the ban was in effect, and was caused by fears that the area was changing. Finally, two employees of the city's department of housing testified that after the ordinance was declared unconstitutional in 1980, the city did not enforce the ban, that "For Sale" signs have appeared in many areas, and that none of the city's 77 neighborhoods have undergone any sudden

changes during that time. Several witnesses for defendant also testified that various areas underwent racial changes while the ban was in effect, and that the increased use of "For Sale" signs has had no effect on the pace of that change. Plaintiff attempts to explain this apparent lack of effect of the recent use of "For Sale" signs by asserting that various realtors and real estate boards have cooperated with the city and community organizations and refrained from placing signs in areas where they might cause panic. If anything, this voluntary cooperation affirms the *Linmark* court's conclusion that the problem is better solved by increased information and discussion than by a blanket prohibition of "For Sale" signs.[1] In the light of the foregoing evidence, we believe that the ordinance provides at best ineffective and remote support for plaintiff's admittedly substantial interest in promoting racially integrated neighborhoods.

Since we have determined that the trial court's finding that the ordinance does not directly advance plaintiff's interest is not against the manifest weight of the evidence, we need not consider whether the ban is broader than necessary to accomplish that objective; under the *Central Hudson* test, both elements must be established. However, we note that plaintiff's own witnesses agreed that "For Sale" signs have no effect in neighborhoods that are not currently undergoing racial change or in close proximity to a changing area; the evidence does not establish how many of the city's 77 neighborhoods are within this category. The testimony deals with five communities which underwent changes in 1968-72, two communities that are currently stable, integrated areas, two that are apparently in the process of change, and two that are currently changing from predominantly black to racially integrated. It appears, then, that the problems here are different from those encountered by the smaller communities considered in other cases involving a ban on "For Sale" signs (*e.g.*, *Linmark*; *Daugherty v. City of East Point* (N.D. Ga. 1978), 447 F. Supp. 290), in that the city is comprised of not one community, but many. We cannot determine from the record before us whether a ban on "For Sale" signs throughout the entire city is too broad, or whether, if needed in some areas, a narrower ban would even be feasible; we therefore express no opinion thereon. However, as noted above, it appears that the city and various communities therein have been able to

---

[1]Other testimony confirms the *Linmark* court's observation that a ban on signs only causes homeowners to turn to other sources of information. Among the panic-peddling techniques employed in Austin were solicitation letters listing all the homes for sale or recently sold in the area, a practice unaffected by the ordinance and at least as effective as posting signs on individual properties.

prevent panic through the voluntary cooperation of brokers and real estate boards, and there is nothing in the record to indicate that this cooperation will not continue or that it will not effectively serve the municipality's goal of promoting stable, racially integrated neighborhoods in conjunction with enforcement of other provisions of the Fair Housing Ordinance found constitutional in *Chicago Real Estate Board v. City of Chicago* (1967), 36 Ill. 2d 530, 224 N.E.2d 793.

Plaintiff further argues, however, that the evidence here is similar to that presented in *Barrick Realty, Inc. v. City of Gary* (N.D. Ind. 1973), 354 F. Supp. 126, *aff'd* (7th Cir. 1974), 491 F.2d 161, and the Supreme Court in *Linmark* refused to express any opinion on whether *Barrick* survived its decision that the Willingboro ordinance was unconstitutional. (431 U.S. 85, 95 n.9, 52 L. Ed. 2d 155, 163 n.9, 97 S. Ct. 1614, 1619-20 n.9.) However, that footnote related to a separate finding that the municipality had failed to prove that panic selling was prevalent in the community; the court expressed no opinion on whether the proof in *Barrick* was sufficient to establish that the ordinance directly advanced the municipality's objectives. The trial court in *Barrick* recognized that "For Sale" signs alone are not the cause of panic selling but one of many tactics of panic peddlers, and appears to have accepted without question or any recitation of supporting evidence that a ban on signs would affect the level of panic. The Supreme Court's rejection of this assumption in *Linmark* persuades us that more extensive analysis is required than that contained in *Barrick*. This is not to say that *Barrick* is irrelevant to our inquiry; other courts have interpreted *Linmark's* reference to *Barrick* in the context of the last of the three questions we consider today, *i.e.*, whether an emergency situation exists which justifies imposition of a ban rather than resort to the alternative remedy of public education and discussion. (See, *e.g.*, *Mayor of Baltimore v. Crockett* (1980), 45 Md. App. 682, 415 A.2d 606, *cert. denied* (1981), 450 U.S. 967, 67 L. Ed. 2d 617, 101 S. Ct. 1485.) We turn now to this final inquiry.

■ Assuming *arguendo* that plaintiff has satisfied the *Central Hudson* test and established both that the ordinance directly advances its asserted interest and that it is not more extensive than necessary to accomplish that goal, it must also establish, under *Linmark*, that an emergency exists which precludes remedying the perceived evils by education and the dissemination of information. Plaintiff asserts that its ban was effective and has reversed the trend of massive racial transition which characterized the late 1960's. The evidence supports the argument that the trend has been halted, although, as noted above, the cause of this phenomenon is not readily apparent from the

record. Nevertheless, it is clear that, for whatever reasons, witnesses were unable to cite a single area of the city undergoing sudden, wrenching change. In fact, the last evidence of such change was for the period 1968-71. Plaintiff contends, however, that it should not be "penalized" for the effectiveness of the ban, and that it is still needed to prevent a recurrence of panic selling. Leaving aside any question of the part the ban played in preventing panic selling, this argument assumes that once an emergency situation arises, a total ban on "For Sale" signs is authorized by *Linmark*, and that the ban may continue once the emergency has passed; that it can continue to assert the "emergency" exception into the indefinite future without ever resorting to the alternative noted in *Linmark*. We do not believe that *Linmark* can be so interpreted, in the light of its express disapproval of the methods employed by plaintiff and its holding that "only an emergency can justify repression." (431 U.S. 85, 97, 52 L. Ed. 2d 155, 165, 97 S. Ct. 1614, 1620.) The strong language employed in that opinion does not sustain plaintiff's assumption that, once it controls the situation, it may sit back and do nothing and expect the courts to condone its failure to develop alternatives to repression. Moreover, it appears that the opening of channels of communication advocated by *Linmark* has been accomplished, as evidenced by the fact that the city, community organizations and brokers are cooperating in efforts to prevent all of the tactics of panic peddling, and that the community organizations mentioned have been effective in combatting such tactics. In effect, plaintiff is now in the position of the village of Willingboro in *Linmark*; it fears that, if the ban is declared unconstitutional, panic selling *will develop*. Its experience since 1980, when the city ceased enforcing the ordinance, indicates that its fears are not well-founded, and we believe that the trial court's finding that plaintiff has failed to prove the existence of an emergency situation justifying a ban on "For Sale" signs is not against the manifest weight of the evidence.

We further note, as did the court in *Linmark*, that our conclusion does not leave the city defenseless in its efforts to promote integrated housing. It may continue the process of education already begun by the Department of Housing and the Commission on Human Relations, as well as pursuing its efforts to obtain the voluntary cooperation of real estate boards and brokers in preventing a return to the panic peddling which disrupted various neighborhoods in the late 1960's. There is nothing in this record to indicate that this cooperation will not continue in the future, particularly in the light of the possibility that, if cooperation does not continue, and an emergency situation again develops, plaintiff might well be justified in reinstituting the

ban on signs. Moreover, should panic selling recur, plaintiff may have less difficulty in proving that "For Sale" signs were a decisive factor, since it appears to have other factors under control. We also feel confident that the various community organizations will continue their efforts to open the channels of communication between residents and brokers, and to inform their neighbors of the viability of integrated communities. Of course, plaintiff remains free to enforce other, constitutionally permissible provisions of its Fair Housing Ordinance in order to prevent a recurrence of the panic selling which characterized the 1950's and 1960's.

 Finally, we address two additional arguments of plaintiff. It asserts that the prohibition on realty "For Sale" and "Sold" signs contained in its zoning ordinance is additional justification for the ban contained in the Fair Housing Ordinance. We fail to see the relevancy of this fact; the complaints in the instant action do not assert a violation of the zoning ordinance, and plaintiff raises this question for the first time in its argument before this court. The trial court was not asked to pass on the validity of the zoning ordinance, and we will not address that question for the first time on appeal. We express no opinion on the validity of that ordinance, since it is not properly before us; however, we note that the ordinance in *Linmark* was part of a zoning ordinance, as were the provisions found unconstitutional in *Daugherty v. City of East Point* (N.D. Ga. 1978), 447 F. Supp. 290, and *Mayor of Baltimore v. Crockett* (1980), 45 Md. App. 682, 415 A.2d 606, *cert. denied* (1981), 450 U.S. 967, 67 L. Ed. 2d 616, 101 S. Ct. 1485. It appears that it is immaterial whether a ban is enacted through a separate ordinance or as a section of a zoning ordinance. If plaintiff's point is that the zoning ordinance bars signs by realtors, but not those by individual homeowners, and is therefore reasonably related to its police power to regulate commercial activity in residential neighborhoods, we reiterate that we will consider that question when it is properly before us and the opposing party has had an opportunity to argue the validity of an ordinance which distinguishes between business entities and private individuals on the question of commercial speech.

Plaintiff also argues that there are alternative means of imparting information on the availability of property, including multiple listing services and newspaper advertisements. The same argument was raised in *Linmark* and rejected by the Supreme Court, which expressly found these alternatives unsatisfactory. 431 U.S. 85, 93, 52 L. Ed. 2d 155, 162, 97 S. Ct. 1614, 1618.

For the foregoing reasons, the judgement of the trial court is affirmed.

Affirmed.

WILSON, P.J., and LORENZ, J., concur.