The **GREATER BALTIMORE BOARD OF REALTORS; Otis Warren & Company, Inc.; Otis Warren, Jr.; Samuel J. Nucci; the Maryland Association of Realtors, Inc.**

v.

**Harry R. HUGHES, Governor of the State of Maryland; Stephen H. Sachs, Attorney General of Maryland; the Maryland Real Estate Commission; Donald E. Howard; Michael P. Goodfellow; William C. Harloff; Albert L. Jones, Sr.; James C. Latham; Robert E. Mitchell; John J. Moran, Jr.; Daniel W. Spaulding; Charles G. Chambers.**

**Civ. No. HM83–4193.**

United States District Court, D. Maryland.

Oct. 29, 1984.

Shale D. Stiller, Peter H. Gunst, Andrew D. Levy, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiffs; William L. Reynolds, Baltimore, Md., of counsel.

Stephen H. Sachs, Atty. Gen. of Maryland, Dorothy A. Beatty, Paul W. Grimm, Robert deV. Frierson, Asst. Attys. Gen., Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

Plaintiffs, two trade associations of Baltimore area realtors, a marketing company, a realtor, and the owner of a Baltimore City residence who would like to sell his

home through a licensed realtor, have sued Harry Hughes, the Governor of Maryland, and the members of the state Real Estate Commission for declaratory and injunctive relief. Specifically, they seek a declaration that § 230C of article 56 of the Annotated Code of Maryland entitled "Suspension of Advertising or Solicitation in Certain Circumstances" and its accompanying regulations, COMAR § 09.11.01.23 (hereinafter "Regulation 23") violate their first amendment right to free speech, their fifth amendment right not to be denied their property, and several rights under the fourteenth amendment. They also seek a preliminary injunction under Rule 65, F.R. Civ.P., restraining defendants' enforcement of a ban on realtor-posted "For Sale" signs. The matter came before the court for hearing on plaintiffs' preliminary injunction motion on May 25, June 1, and June 8, 1984.

*The Regulatory Scheme*

The Maryland legislature enacted § 230C in 1972. The statute was amended in 1982 and in 1983.[1] Pursuant to its authority under § 230C, the Real Estate Commission (hereinafter "REC") later adopted Regulation 23.[2] In summary, the statute and reg-

1. Md.Code Ann. art. 56, § 230C provides:

(a)(1) Following a public hearing, if the Real Estate Commission finds that: (i) the racial or economic stability of a neighborhood is threatened by the volume of real estate transactions, or (ii) an abnormal real estate market with depressed values is developing in a neighborhood because of excessive sales offerings, or (iii) certain methods of advertising or solicitation could be damaging to the public or to the dignity and integrity of the real estate profession, or could be in violation of Article 56 of the Annotated Code of Maryland, or the regulations or code of ethics of the Real Estate Commission of Maryland, the Real Estate Commission may suspend methods of advertising of real estate dealer or brokerage services or of solicitation of listings for houses for the purpose of ultimate resale or rental within geographic urban areas as, in its judgment, would benefit by the suspension.

(2) No suspension shall affect advertising in regularly distributed newspapers, magazines, radio, television, or telephone directories, or be in effect for more than 24 months unless renewed by the Commission for periods not in excess of 24 months.

(3) Such areas shall be referred to as "Real Estate Conservation Areas."

(b) In an action by the Real Estate Commission to modify, remove, or renew a suspension imposed under subsection (a)(1) of this section in a Real Estate Conservation Area, the Commission shall make its determination based on the preponderance of the evidence.

(c) In an action to modify, remove, or renew a suspension imposed under subsection (a)(1) of this section, the Real Estate Commission shall determine whether:

(1) The suspension advances a State interest;

(2) There is a reasonable basis to believe that panic selling, block busting, or depressed real estate market values will occur; and

(3) There is a less restrictive alternative available.

(d) When the Real Estate Commission considers whether to modify, remove, or renew a suspension imposed under subsection (a)(1) of this section, the Real Estate Commission shall provide information to the community affected that includes:

(1) The racial and economic composition of the Real Estate Conservation Area;

(2) The number of real estate transactions in the area; and

(3) The fair market values of properties affected.

(e) Any person aggrieved by the suspension may seek a review thereof by the circuit court of any county.

(f) Any person, firm, partnership, corporation, or association who or which violates the terms of suspension order issued by the Commission is guilty of a misdemeanor and upon conviction thereof is subject to a fine of not more than $1,000 or imprisonment for not more than 1 year, or both.

2. COMAR § 09.11.01/23 provides:

A. Within the geographic areas described below, the Real Estate Commission suspends all methods of advertising real estate dealer or brokerage services, and all methods of soliciting listings for houses, for the purpose of ultimate resale or rental.

B. Included among the acts prohibited by this suspension are all the following:

(1) Door-to-door solicitation in person or by telephone calls to or within the designated areas;

(2) Distribution of circulars, cards, or advertisements;

(3) Posting or placing of "For-Sale" signs.

C. This suspension does not prohibit a real estate broker or salesman from responding in a proper manner to offers or announcements made by a homeowner attempting to sell his own home.

D. This suspension does not affect advertising in regularly distributed newspapers, magazines, radio, television, or telephone directories.

ulation allow the REC, after hearing, to suspend advertising and solicitation of advertising by realtors for a two year period in designated Real Estate Conservation Areas (hereinafter "RECAs"). There are currently sixteen (16) such areas in the northeast and southeast quadrants of Baltimore City.

In order to impose an advertising ban, the REC must find either: 1) that the racial or economic stability of a neighborhood is threatened by the volume of real estate transactions; 2) that an abnormal real estate market with depressed values is developing because of excessive transactions; or 3) that certain methods of advertising or solicitation could be damaging to the public or to the dignity of the real estate profession or in violation of Article 56. Md.Code Ann. art. 56, § 230C. Once the REC makes the appropriate finding it may ban door to door solicitation, distribution of circulars, and the posting of "For Sale" signs

by realtors in the affected RECA. The ban does not include regularly scheduled media advertising or posting of "For Sale" signs by homeowners. Reg. 23, ¶¶ B, C. A ban stays in effect for two years but is renewable for further two year periods if, after hearing, the REC finds that 1) the ban advances a legitimate state interest; 2) there is a reasonable basis to believe that panic selling, block busting, or depressed real estate market values will occur if the ban is lifted; and 3) there is no less restrictive alternative available. *See* Md.Code Ann. art. 56, § 230C(c).

Violation of § 230C is a misdemeanor, punishable by a fine and/or imprisonment. Licensed brokers and agents also risk loss of their licenses. *See* Md.Code Ann. art. 56, § 224. "Aggrieved" persons may seek review in the state circuit courts.

Section 230C and its companion statutes, §§ 230A, 230B and 230D, were enacted in

E. This suspension shall be in effect for the 24 months following its effective date.

F. This suspension covers the following geographic urban areas, which shall be known as "Real Estate Conservation Areas."

(1) Area 1: Chinquapin Park Area (boundaries: Lake Avenue North; York Road on the West; Belvedere on the South; Chinquapin Run on the East);

(2) Area 2: Midwood Area (boundaries: Belvedere on the North; Orkney Road—Clearspring-Beaversbrook-Alhambra—Turnbridge—Ivanhoe on the West);

(3) Area 3: Woodbourne Heights Area (boundaries: Belvedere on the North; The Alameda on the West; Woodbourne on the South; Loch Raven on the East);

(4) Area 4: Perring Loch Area (boundaries: Belvedere Avenue on the North; Loch Raven on the West; Hillen—Perring Parkway on the East; Hartsdale on the South);

(5) Area 5: New Northwood Area (boundaries: Woodbourne on the North; The Alameda on the West; Coldspring Lane on the South; Loch Raven on the East);

(6) Area 6: Stonewood—Pentwood—Winston Area (boundaries: Winston Avenue—Stonewood Road on the North; Hillen Road on the East; Coldspring Lane on the South; Loch Raven Boulevard on the West);

(7) Area 7: Waverly Area (boundaries: 39th Street on the North; Greenmount Avenue on the West; Homestead Street on the South; Ellerslie Avenue on the East);

(8) Area 8: Ednor Gardens—Lakeside Area (boundaries: Argonne—Roundhill on the

North; Ellerslie on the West; 33rd Street on the South; Hillen Rose on the East);

(9) Area 9: Hillen Road Area (boundaries: Coldspring Lane on the North; Roundhill on the South; Hillen Road on the East; Kelway on the West);

(10) Area 10: New Ramblewood Area (boundaries: Belvedere on the South; The Alameda on the West; Loch Raven on the East; Northern Parkway on the North);

(11) Area 11: Loch Raven (boundaries: Loch Raven Boulevard on the West; Belvedere Avenue on the South; City Line on the North; Herring Run Stream on the East);

(12) Area 12: Idlewood (boundaries: Northern Parkway on the South; City Line on the North; The Alameda on the West; Loch Raven Boulevard on the East);

(13) Area 13: Glen Oaks (boundaries: The Alameda on the East; Chinquapin Parkway on the West; Belvedere Avenue on the South; City Line on the North);

(14) Area 14: Frankford (boundaries: City Line on the East; Herring Run on the South to West side of Sinclair Lane; North to Frankford; West on Frankford to Plainfield; Northwest on Plainfield to Hamilton Avenue; Hamilton Avenue on the North to City Line);

(15) Area 15: Belair Edison (boundaries: Sinclair Lane on the East; Erdman Avenue on the South; Moravia Road on the North; West to Woodstock Avenue);

(16) Area 16: Parkside (boundaries: Mannasota Avenue on the West; Homesdale Avenue on the East; Bowley's Lane on the North; Parkside on the South).

an attempt to deter certain predatory real estate practices such as "block busting" and "steering" which encourage "white flight" and "panic selling." [3] The state of Maryland is not alone in attempting to control blockbusting and steering through restrictions on real estate advertising. Other jurisdictions, including Baltimore City, have tried similar measures. Not all have withstood constitutional challenge. *Compare Linmark Associates, Inc. v. Town of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) *with Barrick Realty, Inc. v. City of Gary*, 491 F.2d 161 (7th Cir.1974); *see* Note, " 'For Sale' Signs, Blockbusting, and the First Amendment," 72 NW.U.L.REV. 789 (1978).

Although plaintiffs challenge all of the advertising restrictions permitted under the statute and regulation 23, they seek to preliminarily enjoin only defendants' use of the ban on realtor-posted "For Sale" signs. Since the statute and regulation made no distinction between the findings required prior to imposition of a sign ban and those required to ban other advertising practices, however, a review of the implementation of the overall advertising ban is required.

The controversy presently before the court has a ten year history. This memorandum sets out the chronology of the controversy in some detail to provide a factual background to plaintiffs' motion for preliminary injunction. In order to resolve that motion, however, the court need not decide the constitutionality of each and every instance in which the REC established or renewed the advertising restrictions in a given RECA. Instead, the court will concern itself primarily with the last renewal of the restrictions which occurred in late 1983.

### Implementation of the Regulatory Scheme

In 1972, the REC promulgated regulation 28. That regulation prohibited licensed agents and brokers from door-to-door and telephone solicitation and from distributing brochures advertising their services in certain designated areas. Regulation 28 did not prohibit the posting of "For Sale" signs. It was applied to twelve (12) northeast Baltimore City areas, ten of which remain RECAs today.

The REC first utilized § 230C and what is now regulation 23 [4] on July 18, 1974 when it voted to designate twelve (12) RECAs in northeast Baltimore and to ban solicitation and realtor-posted signs in those areas. *See* paper # 17, ex. B. The resolution adopted by the REC and the minutes of its meeting do not indicate whether the REC considered any documentary or statistical evidence in coming to its decision.[5] *See* paper # 25, ex. A. The

---

**3.** In *Barrick Realty, Inc. v. City of Gary*, 354 F.Supp. 126, 134 (N.D. Indiana 1973), *aff'd*, 491 F.2d 161 (7th Cir.1974), the District Court defined blockbusting as follows:

Blockbusting refers to the practice of directly inducing or persuading an individual to sell his home by representations as to the entry into his neighborhood of blacks or other minority groups.

It went on to describe panic selling as

a broader problem which, although it may be prompted by blockbusting practices, does not depend upon direct inducements or face to face contact between people. Panic selling occurs when a resident who is otherwise disposed to remain in a neighborhood succumbs to any one of a number of pressures to move out when it appears that a minority racial group is beginning to enter. Among the fears of white residents as non-whites begin to move into their neighborhood are rising crime rates, overcrowded schools, declining property values, and a generally lower quality

of life. As neighbors move away, there is also the feeling of being left behind, giving rise to the commonly-expressed fear, independent from any intrinsic hostility toward the incoming racial group, of being "the last white family on the block." Where these fears persist and intensify, panic selling generally occurs on a wide scale.

*Id.* at 134–35.

Blockbusting and panic selling are often accompanied by steering, that is, realtors showing certain of their listings only to customers of one race.

**4.** Regulation 23 is the redesignation of the REC's earlier regulation 30 which originally took effect on January 15, 1975. Affidavit of Albert L. Jones, Def. Hrg. ex. 11 at para. 10, 17.

**5.** A survey done by the Division of Investigative Services of the REC just prior to the imposition of the sign ban in 1974 revealed only eight "For Sale" signs in the twelve RECAs, three of which

record does reflect that the REC held a public hearing on June 19, 1974 to review its earlier designation of neighborhoods for protection under regulation 28 and to determine whether those neighborhoods should be afforded protection under the broader authority of § 230C. In addition, a purpose of the hearing was to determine whether "For Sale" signs should be banned in these neighborhoods. Aff. of Albert L. Jones, paper # 25, ex. G, p. 2 at ¶ 7.

The resolution indicates the REC believed that regulation 28, which did not contain a sign ban, had "effectively stopped" most blockbusting and panic selling. The resolution goes on to conclude, however, that a sign ban was needed because "the stability reached to date is not such that the fears of the past no longer exist." Paper # 17, ex. B, ¶¶ 3–8.

The REC, in imposing the sign ban, made no finding that panic selling was occurring in any of the RECAs, or anywhere else in Baltimore City. Instead, the imposition of the sign ban was based on that portion of § 230C which authorizes a ban if such advertising "could be damaging to the public or to the dignity and integrity of the real estate profession, or could be in violation of article 56 of the Annotated Code of Maryland. ..." *Id.* at pp. 3–4.

At the same time that the REC instituted its first sign ban, Baltimore City approved an ordinance, No. 701, which banned "For Sale" signs in all "residence and office-residence" zoning districts. That ordinance was later challenged under the Supreme Court's holding in *Linmark* and struck down by the Maryland Court of Special Appeals. *See City of Baltimore v. Crockett*, 45 Md.App. 682, 415 A.2d 606, *cert. denied*, 288 Md. 733 (1980), *U.S. cert. denied*, 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 616 (1981). The Maryland court's *Crockett* opinion is not dispositive of the instant case because the City did not argue its ban was aimed at fostering stable integration.

The next potentially important event in the history of § 230C was the Supreme Court's 1977 decision in *Linmark Associates, Inc. v. Town of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). In that case, which is discussed at length in a later section of this memorandum, the Court struck down a city ordinance banning the posting of "For Sale" signs on first amendment grounds. The town defended the suit on the basis that its ordinance was aimed at stopping "panic selling" and "white flight" in the community. The Court found that, while "promoting stable racially integrated housing" was an important government interest, the town had failed to show that the ordinance actually advanced that interest. 431 U.S. at 94–95, 97 S.Ct. at 1619.

On January 19, 1977, shortly before the *Linmark* decision was announced, the REC renewed the advertising ban. It held a hearing prior to taking that action but the records of that hearing are no longer available. Tr. at p. 267 (Testimony of Mildred Jones, June 1, 1984). The REC did not reconsider its decision after *Linmark* in spite of the factual similarities to § 230C and its implementing regulation. *See* paper # 25, ex. C.

On March 15, 1978, the REC designated four additional RECAs: Loch Raven, Idlewood, Glen Oaks and Pen Lucy. No exhibits setting forth the basis for the REC's action exist. Two months later, on May 15, 1978, the Frankford Improvement Association requested conservation status for Frankford. Three of the commissioners stated that they were personally aware of the problems in Frankford. The REC voted to accord RECA status to Frankford at the May meeting. Both the March and May designations followed public hearings. The records of these hearings are unavailable. Def. hrg. ex. 9.

The next renewal of the ban came before the REC at its May 16, 1979 meeting. The records of the hearing which preceded this meeting are also unavailable. Hence, there is no record of the evidence considered by the REC prior to renewing the ban at the

were posted by homeowners. Paper # 25, ex. A, p. 2.

May meeting. The minutes show that Commissioner Jones stated the ban was being renewed under subsection (a)(1)(iii) of § 230C. That subsection provides for an advertising ban when the REC finds that certain real estate practices could be damaging to the public or to the dignity of the real estate profession. *See* paper # 25, ex. D. The next year the Attorney General of Maryland found that basis to be unconstitutional under the Supreme Court's *Linmark* and *Central Hudson Gas and Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) opinions. 65 Op.Att'y Gen. 67 (1980). The Attorney General also opined that subsection (a)(1)(ii) of the statute was an unconstitutional infringement on first amendment rights to free speech. Because of a later decision by the REC not to rely on subsections (a)(1)(ii) or (iii), the court need not reach the constitutionality of these provisions.

In his opinion the Attorney General recommended that the REC apply a three-part test in determining whether to establish or renew a sign ban in any given RECA. *See* Op.Att'y Gen. at 76. A variation of this test was incorporated into the statute in 1983. *See* Md.Code Ann. art. 56, § 230C(c). The Attorney General's test required the REC to find that: 1) the volume of real estate transactions within a specific RECA threaten[ed] its racial stability; 2) the advertising ban would advance directly the state's interest in preserving a RECA's racial stability; and 3) the ban was not more extensive than necessary. Commissioner Howard indicates that the REC began to apply the Attorney General's test in 1980. *See* paper # 25, ex. E at pp. 80–81.

The REC held another public hearing on renewal of the ban on November 6, 1980. The requesting communities presented some statistical evidence at that hearing.[6] It, however, was not keyed specifically to individual RECAs. In addition, only ten of the then seventeen RECAs presented even subjective evidence.

In February 1981, after hearing, the REC added two additional RECAs, Belair-Edison and Parkside. At the time these areas were 87.32% and 69.33% white, respectively. (1980 Census figures). The racial composition of Baltimore City as a whole was 43.8% white and 57.2% non-white in 1980. Commissioner and Commission designee witness Albert Jones testified that the REC's goal in extending the "For Sale" ban to Belair-Edison was to secure "stabilization" for the area, not "integration." *See* paper # 25, ex. G, pp. 100–02.

The REC held its next public hearing on ban renewal on October 20, 1982. *See* paper # 17, ex. D. Prior to that hearing, the REC published a notice in the Maryland Register setting out criteria for the evidence to be received. (Vol. 9, Issue 19).[7]

---

**6.** Statistical evidence concerning the potential for "panic selling" in the RECAs was presented by Michael Cassell, President of the Real Estate Brokers of Baltimore, Inc. He demonstrated that of the 32,312 homes located within the three zip codes which largely embraced the RECAs, only 473, or less than 1.5%, were listed for sale. Paper # 25, ex. F, pp. 10–11. In *Linmark,* Justice Marshall concluded that the presence of "For Sale" signs in front of 2% of Willingboro's homes did not constitute proof of panic selling. 431 U.S. at 95, 97 S.Ct. at 1619.

**7.** The notice stated in relevant part:

For nearly ten years, the Commission has imposed a ban on "For Sale" signs in these areas as a means of maintaining integrated housing and racial stability. In the course of the past decade, the Supreme Court of the United States had made several important decisions that directly relate to the State's power to ban "For Sale" signs and related activities under the United States Constitution. In addition, the Attorney General of Maryland has advised the Real Estate Commission concerning Real Estate Conservation Areas and what evidence must be adduced from those who wish to continue the existence of the conservation area designations.

The burden of supplying the Real Estate Commission with evidence necessary to consider the renewal of the designation and a "For Sale" sign ban rests with the general public. In order for the Commission to approve any renewals, it must find from the evidence produced during the hearing that the following facts are present in each of the proposed conservation areas: 1.) The initial conservation area designation and "For Sale" sign ban was justified by the record established at the time of the ban's original imposition in that the racial stability of the neighborhood was

Again, the statistical evidence presented at the hearing was minimal and not all of the RECAs submitted even subjective evidence. On recommendation of the Assistant Attorney General, the REC voted to deregulate entirely eleven RECAs, and to abolish the "For Sale" sign ban in all but three of the remaining eight RECAs. Paper # 25, ex. H, I; see paper # 2, ex. A.[8] At a subsequent meeting on March 16, 1983, however, the REC voted to reimpose all restrictions in the nineteen RECAs if the Attorney General would agree to defend it in any *Linmark* -type litigation. Paper # 25, ex. J.

The Attorney General declined the REC's proposal. The matter was not closed, however, and the REC scheduled a second public hearing for June 29, 1983. That hearing was the most extensive of any held on the advertising ban and a large quantity of evidence was presented. The hearing was not adversarial and the REC members did not ask questions. See paper # 17, ex. D. It is this hearing and the preceding October 20, 1982 hearing which are the focus of the court's concern because, on July 20, 1983, the REC voted to reinstitute the advertising ban, including the prohibition of "For Sale" signs, in all but three RECAs.[9] The REC's action became final on November 7, 1983. See 10:22 Md.R. 1965 (Oct. 28, 1983). Plaintiffs filed this action approximately one month later on December 8, 1983.

*Evidence Presented to the REC at the 1982 and 1983 Hearings*

The October 20, 1982 hearing opened with a recitation of the standard the REC planned to apply to the renewal of the then-nineteen RECAs. Only fourteen out of the nineteen RECAs presented subjective evidence to the REC at this meeting; that is, the testimony of one or more residents concerning their views and observations. St. Bernard's Parish (Area # 9), Homestead (Area # 10), Hillen Road (Area # 11), and Pen Lucy (Area # 16) presented no evidence of any sort at this hearing.

Many of the individuals who testified related the problems their areas had experienced with block busting in the late 1960s and early 1970s. A number also discussed their concerns about and observations of steering in their areas today. Those discussing steering included the representatives of Midwood (Area # 2), Frankford (Area # 12), New Ramblewood (Area # 13), Belair-Edison (Area # 18), and Parkside (Area # 19). Another concern expressed by the spokespersons was the potential for increased sales activities in the future because of falling interest rates. Many felt residents would become concerned if such activity was visible in their communities.

The REC received three pieces of statistical evidence at the October 1982 hearing. These included two Baltimore Neighbor-

---

threatened by the volume of real estate transactions; 2.) The conservation area designation and "For Sale" sign ban has had an effect in stabilizing the neighborhood; 3.) There is a reasonable basis to believe that, if the conservation area designation or "For Sale" sign ban is not continued, panic selling will again result and the volume of real estate transactions will again threaten the racial stability of the neighborhood.

8. The Commission voted to deregulate entirely Midwood, Woodbourne Heights, Perring Loch, Stonewood-Pentwood-Winston, St. Bernard's Parish, Homestead-Montebello, Hillen Road, New Ramblewood, Loch Raven, Glen Oaks and Pen Lucy, and to abolish the "For Sale" sign ban, while retaining all other restrictions, in Chinquapin Park, Northwood, Waverly, Ednor Gardens/Lakeside and Idlewood. The sign ban

was renewed only in Belair-Edison, Parkside and Frankford.

9. The Commission concluded that sixteen neighborhoods had produced sufficient evidence to support renewal of conservation area status. Area # 1 (Chinquapin Park), Area # 2 (Midwood), Area # 3 (Woodbourne Heights), Area # 4 (Perring Loch), Area # 5 (New Northwood), Area # 6 (Stonewood, Pentwood, Winston), Area # 7 (Waverly), Area # 8 (Ednor Gardens, Lakeside), Area # 11 (Hillen Road), Area # 12 (New Ramblewood), Area # 13 (Loch Raven), Area # 14 (Idlewood), Area # 15 (Glen Oaks), Area # 17 (Frankford), Area # 18 (Belair-Edison), and Area # 19 (Parkside). Three areas did not submit legally sufficient evidence to support renewal of conservation area status: Area # 9 (St. Bernard's Parish), Area # 10 (Homestead, Montebello), and Area # 16 (Pen Lucy).

hoods, Inc. ("BNI") studies of the NECO [10] and HARBEL [11] areas, a study documenting the existence of steering in the HARBEL area, and a study entitled "Northeast and Southeast: Ten Years of Change."

The BNI study of communities in the NECO area examines racial change over the period 1970 to 1980 and compares turnover rates in these communities to those in control communities for the period 1973–79. With respect to racial change, the study concludes that the number of integrated neighborhoods (those neighborhoods with non-white populations of between 30–70%) has increased in the NECO area. However, the number of segregated neighborhoods (those neighborhoods with non-white populations in excess of 70%) has also increased, leading the authors of the study to conclude that the NECO area is vulnerable to resegregation. The report concludes that while racial change by neighborhood in Baltimore City has been modest, change within the NECO communities has been somewhat more pronounced. With respect to housing turnovers generally, the report concludes that the NECO communities experienced less of an increase during the period 1973–79 than did the control communities. The authors concluded that RECA status was the likely cause of this differential.

The BNI study of Frankford, Belair-Edison, and Parkside dealt only with turnovers. The study concluded that RECA status in Frankford was associated with a drop in turnovers. The data concerning Belair-Edison and Parkside was inconclusive.

The HARBEL steering study includes the communities which comprise Areas # 17–19. That study concludes that steering and other forms of differential treatment by realtors were currently occurring in the HARBEL area. Finally, the "Northeast and Southeast" study, which examined attitudes toward racial change for the peri-od 1969–79, concludes that residents of the surveyed communities in northeast Baltimore perceived no significant racial change over the period.

The 1983 hearing occurred on June 29, 1983. Fewer individual community representatives gave testimony at that hearing than did at the 1982 hearing. The REC had told the communities previously, however, that it would reconsider all the evidence presented at the 1982 hearings. A number of individuals did offer affidavits in which they testified about their subjective perceptions of community attitudes. Several experts offered their opinions at this hearing. They include: 1) Dr. Ralph Taylor, a social psychologist; 2) Roger Windsor and Mark Sissman of the Baltimore City Department of Housing and Community Development; 3) Glenwood Brooks, a psychologist; and 4) Gilbert Sandler, an advertiser. Dr. Taylor spoke primarily about a survey of RECA residents which he had authored. He told the REC that the survey results indicated low levels of realtor initiated activity in the RECAs. He also said that the survey showed extensive evidence of realtor-posted "For Sale" signs and a concern on the part of long term residents, those who moved into the areas prior to 1974, over their reappearance. The representatives of the City Department of Housing and Community Development testified that new homeowners in the NECO and HARBEL areas received city mortgage money without respect to race and that the racial breakdown of the individuals receiving such monies was 50/50. They also testified that resegregating and rapidly changing neighborhoods were a drain upon the City's treasury because they required additional programs and funding. Dr. Brooks, the psychologist, testified on the impact of signs as did Mr. Sandler, the advertiser.

The statistical evidence presented at this hearing included data extracted from the

---

**10.** NECO is an acronym for Northeast Community Organization, an umbrella organization of community and business groups which serves many of the RECAs.

**11.** HARBEL is an acronym for the communities between Harford and Belair Roads in Baltimore City.

Lusk reports[12] which indicated that sales in the NECO communities decreased as a percentage of Baltimore City sales in the late 1970s following the imposition of the sign ban. Census Note 7, prepared by the staff of the Metro Center at Johns Hopkins University, was also presented at the hearing. It indicated that housing prices in the NECO area either stayed the same or decreased slightly during the 1970s. Finally, the questionnaire and results discussed by Dr. Taylor in his testimony were submitted for the REC's consideration.

*Evidence Presented to the Court on May 25 and June 1, 1984*

The court held a two-day evidentiary hearing on plaintiff's motion for a preliminary injunction on May 25 and June 1, 1984. At that time the court heard the testimony of four live witnesses and three witnesses whose depositions were read into the record. In addition, the court received a number of affidavits and certain documentary evidence.

The first witness testifying on behalf of the plaintiffs was Otis Warren, a Baltimore City broker who is a named plaintiff in this action. Mr. Warren testified that he has been a broker and realtor for 35 years. He believes that "For Sale" signs are his most effective form of advertising.[13] He also indicated that his company posts a sign only after securing the owner's consent. He went on to observe that the "For Sale" sign is only one of many advertising tools which he and other realtors use in their business. In particular, he indicated that his company uses the Multiple List.[14]

When asked about doing business in the NECO area, Mr. Warren indicated that he used to belong to the NECO marketing program, a community organized program designed to encourage homeowners to sell by themselves rather than through realtors. He indicated that he left that program because of the costs and because he did not feel comfortable with the philosophy. He did admit, however, that he was never precluded from doing business in the RECAs which are situated in the NECO area. He did observe that he found it difficult to recruit agents to work within the areas because the agents generally felt unwelcome.

The next witness on behalf of plaintiffs was Samuel Nucci, a Baltimore real estate agent. He owns a home in one of the RECAs and wishes to sell it through a brokerage. He would also like to post a brokerage sign in front of the house. Like Mr. Warren, Mr. Nucci indicated that he uses a number of advertising methods in his business. He testified that he receives one-third to one-half of his responses from signs but agreed that it was not possible to measure the impact of signs on ultimate sales.

Mr. Nucci does business in both Ridgley, a non-RECA community located just over the Baltimore City line in Baltimore County, and Idlewood, a RECA located in Baltimore City. He testified that the housing stock in these two areas is comparable and that the potential buyers are similar. He argued that the inability to use signs has inhibited his sales in Idlewood. He also observed that, to his knowledge, no panic selling has occurred in Baltimore in the past ten years.

Both sides offered excerpts from the depositions of three present and former members of the REC. The first deposition witness was James E. Latham, a member

12. The Lusk reports are a standard information source of actual sales prices for residential properties.

13. Mr. Warren testified that the cost of a standard reusable "For Sale" sign was $16 while the price of newspaper advertising was approximately $.70 per line. Tr. at p. 9. He said, however, that he was unable to quantify the impact of a sign on the ultimate sale of the property.

14. The Multiple List is a subsidiary of plaintiff, Greater Baltimore Board of Realtors. It provides its members with various kinds of information on properties which are up for sale including location, price range, size and number of rooms, financing, amenities, and whether or not the property is vacant.

of the REC since 1968. The excerpts from Mr. Latham's deposition chosen by both parties concerned Regulation 28,[15] the anti-solicitation ban which is the precursor of Regulation 23. Commissioner Latham testified that Regulation 28 was intended to reduce panic selling. Prior to enacting Regulation 23 in 1974, however, the REC did not attempt to determine if Regulation 28 had indeed stopped panic selling and it did not have any racial data before it when it voted to enact the sign ban. Commissioner Latham indicated the REC heard testimony in 1974 that signs induced panic selling and were the "worst" solicitation technique. When asked about the presence or absence of block busting in Baltimore, Commissioner Latham indicated that he was aware of some blockbusting in the city after 1971. He commented that the REC has never used its injunctive powers to control that practice. He also observed that the REC had no jurisdiction over private homeowners and, therefore, could not ban owner-posted "For Sale" signs.

The next deposition witness was Donald E. Howard, the present chairman of the REC. He was noted as the designee witness for 1977 to the present and as an individual. Only the plaintiffs designated excerpts from his deposition. Commissioner Howard testified that the REC has held hearings on RECA status every two years since 1977. He noted that the REC currently utilizes the test set forth by the Attorney General in his 1980 opinion when determining whether to impose or renew the sign ban in a given area. *See* 65 Op. Att'y Gen. 67, 76 (1980). He went on to add, however, that until July 1, 1983 the REC had no obligation to develop data to support its determinations. He testified that the REC never discussed a less restrictive alternative to the sign ban and did not make any efforts to test for panic selling when the sign ban was temporarily lifted in 1983.

The final deposition witness was Albert L. Jones, Sr. Mr. Jones has been a member of the REC for a number of years. He was noted as the REC's designee for the period prior to 1977. Commissioner Jones' testimony centered around the rationale for Regulations 28 and 23. In response to questions from plaintiffs' attorney, Commissioner Jones testified that the purpose of both regulations was "stabilization" and that the REC was not concerned with "racial mix." The specific testimony bears quotation.

I think the Commission's aim was to respond to the area and to respond to the peoples' need in the area. The race mix wasn't, as far as I know, was never a problem as far as designating an area. It was stabilizing the area and stabilizing, keeping the area from panic selling and being subjected to wide curves of values because of an excessive number of for sale signs driving the prices down.

Tr. at p. 76. Commissioner Jones indicated that the REC never refused RECA status to a requesting community and that it was not concerned with the percentage of whites and non-whites in such a community. Rather, the REC responded when community members, both black and white, complained about a proliferation of signs. He also noted the REC received complaints in 1983 when the sign ban was temporarily lifted but he indicated that he did not know if panic selling took place during that time. He observed that there was some voluntary compliance by realtors during this period.

Defendants' first witness was Dr. Ralph Taylor, a social psychologist at Johns Hopkins University. He was qualified as an expert on the effect of RECA status on a community and the dynamics of neighborhood change. Dr. Taylor testified that he bases his opinion on a "multi-method approach" which requires that he collect and evaluate data from a number of sources. In preparation for his testimony, he indicated that he had reviewed newspaper accounts of blockbusting and other predatory real estate practices in Baltimore from 1950–83. *See* paper # 7, ex. A. He also looked at the transcripts of the 1980–83

---

**15.** *See* Memorandum, *supra* p. 4.

hearings before the REC, reviewed data from the questionnaire results which he submitted to the REC in 1983, and reviewed the various theories used in his profession.

Dr. Taylor testified that neighborhood integration means either the white or non-white population must range between thirty and seventy percent. In 1980 there were 237 neighborhoods in Baltimore City; only 35 of them were integrated. Dr. Taylor went on to identify a phenomenon called resegregation. He testified that resegregation occurs when a neighborhood changes from being more than seventy percent white to being integrated but then continues to change until more than seventy percent of its residents are non-white. He observed that a large segment of northwest Baltimore experienced resegregation in the 1960s and early 1970s.

One of the causes of resegregation identified by Dr. Taylor is panic selling. He defines panic selling as

a process whereby an individual puts his or her house on the market sooner than he or she would otherwise have; or sells his or her house at a lower price than he or she would otherwise have, due to a concern about changing community dynamics in the immediate area.

Tr. at p. 136. In Dr. Taylor's opinion certain events occurred in northeast Baltimore during the period 1955–70 which indicate the presence of panic selling pressures. Specifically, these events occurred in Areas # 5, 6, 8 and 11. Dr. Taylor concluded also that the RECA communities in northeast Baltimore were more successful in the 1970s than were comparable non-RECA communities. They were more viable; that is, they had higher instances of homeownership and owner occupation. In addition, the number of integrated neighborhoods in the RECA communities increased as a percentage of the city's integrated neighborhoods. Dr. Taylor attributes some of the RECA communities' success during the 1970s to the ban on "For Sale" signs. In

his opinion the pressures surrounding panic selling *could* increase in the RECAs if the sign ban is lifted and resegregation *could* occur.

A good deal of Dr. Taylor's testimony dealt with the questionnaire which he prepared at the request of NECO and submitted to the REC. The questionnaire sought to gauge community attitudes toward "For Sale" signs and the sign ban. During his testimony Dr. Taylor acknowledged that the hand tabulated questionnaire results which he submitted to the REC contained some mathematical errors. In his opinion, however, these errors are not statistically significant. He also acknowledged that there were not sufficient responses to generate accurate data on a neighborhood by neighborhood basis for all but six of the participating neighborhoods and that blacks were underrepresented in the survey. In spite of these problems with the questionnaire, however, Dr. Taylor believes that the general observations he made before the REC in June 1983 remain valid. At that time he indicated that realtor initiated activity was fairly low in the sampled areas, but that the sighting of "For Sale" signs was quite extensive. He also observed that long term residents showed significant concern at the reappearance of the signs.[16]

On cross-examination, Dr. Taylor acknowledged that other more detailed work which he had done indicated racial change in Baltimore neighborhoods city-wide had been rather modest during the 1970s. Specifically, in Census Note 2, he and his colleagues found that there had been less racial change in Baltimore neighborhoods in the 1970s than in the 1960s and that the change had followed a *checkerboard* pattern. He attributed this checkerboard pattern to the particular characteristics of the affected neighborhoods. In addition, he acknowledged that, in Census Note 7, he had determined that changes in housing prices city-wide had been modest during the 1970s.

---

**16.** *See* Paper # 1, ex. B at p. 39. The survey about which Dr. Taylor testified was conducted

in 1983 during the temporary lifting of the sign ban.

The defendants' final witness was Mildred Jones, a former member of the REC who is actively involved in NECO. Ms. Jones testified about her own experience with panic selling in northwest Baltimore. She also indicated that panic selling was beginning in northeast Baltimore when she moved there in the late 1960s. As a community activist committed to integration, Ms. Jones worked actively to stop panic selling and was a primary proponent of the sign ban. She indicated that, in her opinion, a ban on solicitation only was not sufficient to stop panic selling. She also indicated that members of her community were fearful when signs were once again posted during early 1983.

Most of the remaining evidence brought before the court was statistical and documentary. The plaintiffs offered data taken from the Multiple List. The charts they have submitted show that residential property values in the RECAs rose steadily during the period 1980–83 and that the rise was approximately equal to the rise experienced in adjoining neighborhoods which do not enjoy RECA status. The charts indicate also that turnover rates in the RECAs during this period never exceeded 3% and rarely exceeded 2%. The plaintiffs also offered the deposition of James Fennessey, a sociologist and statistician. Dr. Fennessey's deposition was offered only for the criticism of Dr. Taylor's methodology contained therein. In essence, Dr. Fennessey found that a number of the questions written by Dr. Taylor were awkwardly phrased and that some were suggestive. He discussed also the acknowledged undersampling of black residents. During the course of the deposition, Dr. Fennessey admitted that he had never conducted neighborhood level surveys and that he has never specifically studied the blockbusting.

The defendants submitted a number of affidavits of RECA residents. These residents all described the incidents of panic selling which they witnessed in their neighborhoods some twenty years ago and the effectiveness of the sign ban in curbing the panic. Two indicated that the anti-solicitation ban had not been sufficient. Def. Hrg.

ex. 3, 6. Some affiants indicated also that signs had reappeared in their neighborhoods in 1983. *See* Def.Hrg. ex. 5–7, 19. Only one affiant, Jean Snyder, testified to more recent instances of panic selling and the impact of signs. Ms. Snyder described panic selling in her community in the late 1970s. Ms. Snyder's neighborhood did not become a RECA until 1980.

*Applicable Law*

a. the legal standard

The Fourth Circuit's standards for issuing preliminary injunctions under Rule 65(a) of the Federal Rules of Civil Procedure are set out in *North Carolina State Ports v. Dart Containerline*, 592 F.2d 749, 750 (4th Cir.1979) and *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 195–97 (4th Cir.1977). The Court of Appeals applies a balance-of-hardship test. The four factors considered under that test are:

1) plaintiff's likelihood of success in the underlying dispute between the parties;

2) whether plaintiff will suffer irreparable injury if interim relief is denied;

3) the injury to defendant if an injunction is issued; and

4) the public interest.

*North Carolina*, 592 F.2d at 750. In discussing the interrelationship of these factors, the court said:

There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at

least, grave or serious questions are presented.

*Id.*

This court will consider each of the factors outlined above, paying particular attention to the prospective injuries asserted by the parties.

b. likelihood of success on the merits

Plaintiffs claim that they are entitled to a preliminary injunction barring defendants from enforcing the "For Sale" sign ban during the pendency of this litigation. They offer both first amendment rights to freedom of commercial speech and fourteenth amendment rights to equal protection and procedural due process in support of their motion. Both parties recognize, however, that the first amendment issues are the most significant. Accordingly, the court will discuss the commercial speech arguments first.

c. First Amendment Commercial Speech

The parties agree the major cases the court should consider in determining the strength of plaintiffs' claim are *Linmark Associates, Inc. v. Town of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), *Central Hudson Gas and Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). All these cases address the amount of protection afforded under the first amendment to so-called "commercial speech" and the conditions under which the government may restrict such speech.

In *Linmark* a unanimous Supreme Court struck down a municipal ordinance banning "For Sale" and "Sold" signs in the township of Willingboro, New Jersey. Both parties agree that the factual setting of *Linmark* is quite similar to the situation in the case at bar. During the 1970s Willingboro, a community near Fort Dix, McGuire Air Force Base, began to experience a decrease in its white population and a concomitant increase in its non-white population. Levitt & Sons, Inc. developed the community in the late 1950s. Initially, it was predominantly white. The testimony at trial indicated that by early 1973 the community had become concerned about the changing population and the idea of a ban on "For Sale" signs was entertained by the mayor and town council. A number of individuals, including the mayor, believed that the population shifts were a primary result of white flight and panic selling. The town council held two public hearings in early 1974 on a proposed ordinance banning the posting of "For Sale" signs. The testimony at those hearings did not focus on racial integration. Rather, those who testified appeared to be primarily concerned with aesthetic considerations and the general effect of signs and transiency on property values. 431 U.S. at 90, 97 S.Ct. at 1617. The town council adopted the ordinance by unanimous vote after the second hearing. A property owner and a local realtor then brought suit.

The ordinance was in effect for nine months prior to the trial. During that time the town collected no statistical data to support its claim that the ban had been effective in reducing selling caused by racial fear. Indeed, some real estate witnesses testified that their business had actually increased after the ban had been imposed. The District Court ruled that the ordinance was an unconstitutional infringement on commercial speech. The Court of Appeals affirmed.

Justice Marshall framed the issue before the Supreme Court as follows:

This case presents the question whether the First Amendment permits a municipality to prohibit the posting of "For Sale" or "Sold" signs when the municipality acts to stem what it perceives as the flight of white homeowners from a racially integrated community.

431 U.S. at 86, 97 S.Ct. at 1615. He then proceeded to analyze the case in light of the Court's prior decisions on commercial speech. The opinion acknowledged that the town's purported basis for its ordinance, the promotion of stable, racially integrated housing, was an important state

goal. It went on to conclude, however, that the town had "failed to establish that this ordinance is needed to assure that Willingboro remains an integrated community." 431 U.S. at 94–95, 97 S.Ct. at 1619. This portion of the Court's holding would appear to indicate that sign bans may be appropriate in some circumstances when the state can demonstrate that a ban is both needed and effective. The Court's opinion, however, goes on to state:

The constitutional defect in this ordinance, however, is far more basic. The Township Council here, like the Virginia Assembly in *Virginia Pharmacy Bd.*, acted to prevent its residents from obtaining certain information. That information, which pertains to sales activity in Willingboro, is of vital interest to Willingboro residents, since it may bear on one of the most important decisions they have the right to make: where to live and raise their families.

431 U.S. at 96, 97 S.Ct. at 1620. Plaintiffs submit that this portion of the opinion suggests bans on commercial speech relating to "vital" and "important" decisions which citizens must make cannot be imposed even if they are needed and effective.

The next relevant commercial speech case decided by the Court was *Central Hudson.* In that case the Court held that a New York Public Service Commission regulation which completely banned electric utilities from advertising to promote the use of electricity violated the first and fourteenth amendments. In the Court's opinion Justice Powell observed that "[t]he protection available for particular commercial expression turns on the nature of both the expression and of the government interests served by its regulation." 447 U.S. at 562–63, 100 S.Ct. at 2349–50. He went on to set out a four-part test applicable to cases involving infringement on commercial speech.

At the outset we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask wheth-er the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. at 2351. Defendants assert that this test represents a narrowing of the standards set out earlier in *Linmark* and is the appropriate test to apply to the facts of the instant case.

Defendants draw support for their view from Justice Blackmun's concurrence in *Central Hudson.* Justice Blackmun merely concurred in the judgment because he felt that the standards used by the Court were "not consistent with ... prior cases and [did] not provide adequate protection for truthful, nonmisleading, noncoercive commercial speech." 447 U.S. at 573, 100 S.Ct. at 2355. He argued that the Court had misconstrued its earlier opinion in *Linmark* and that *Linmark* suggested a broader level of protection for commercial speech. In particular, he cited to the paragraph in *Linmark* where the Court indicated that there was a basic constitutional defect in the ordinance. *See supra,* 431 U.S. at 96, 97 S.Ct. at 1620.

Defendants' argument that a *Central Hudson* analysis, and not the broader test articulated in *Linmark*, should apply here is somewhat weakened by the Court's most recent commercial speech case, *Bolger v. Youngs Drug Products.* In that case a drug company that manufactured prophylactics challenged 39 U.S.C. § 3001(e)(2), a statute which prohibits mailing of unsolicited advertisements for contraceptives. The Court applied the four-part *Central Hudson* test and concluded that the statute violated the first amendment. It found one of the asserted government interests, assisting parental "efforts to control the manner in which their children become informed about sensitive and important subjects such as birth control," to be substantial. 463 U.S. at ——, 103 S.Ct. at 2882–83. It went on to find, however, that the stat-

ute provided only "incremental" support for the state objective and that less restrictive alternatives existed.

In the final paragraph of the opinion, the Court indicated that it had another basis for its decision. Citing to *Linmark*, the court explained:

> Because the proscribed information 'may bear on one of the most important decisions' parents have a right to make, the restriction of 'the free flow of truthful information' constitutes a 'basic' constitutional defect regardless of the strength of the government's interest.

463 U.S. at ——, 103 S.Ct. at 2885. Plaintiffs assert that the inclusion of this second rationale by the Court indicates the broader test enunciated in *Linmark* still applies to commercial speech which bears on "important" or "vital" decisions.

■ The court believes that it should apply the four-part *Central Hudson* test, and not the broader *Linmark* standard, in this matter. The Supreme Court formulated the four-part test some years after deciding the *Linmark* case. It has utilized the test in all its subsequent content-based discrimination cases including *Bolger.* This court believes that the Supreme Court's citation to *Linmark* and its use of the *Linmark* test as the second basis for its ruling in *Bolger* does not herald a return of the broader standard. Contraception, the subject matter of the *Bolger* decision, has been of special concern to the Court for many years. *See Carey v. Population Services International*, 431 U.S. 678, 700–01, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977). It was that concern only, and not a desire to announce the revival of a broader standard in various categories of commercial speech cases, which prompted the Court to cite to *Linmark*[17] Indeed, the first sentence of the paragraph which cites to *Linmark* states:

> Section 3001(e)(2) is also defective because it denies to parents truthful information *bearing on their ability to discuss birth control and to make in-*

*formed decisions in this area.* (emphasis supplied)

463 U.S. at ——, 103 S.Ct. at 2885. Accordingly, the court will weigh the evidence before it under the four factors set out in *Central Hudson.* The four factors are: 1) whether the commercial speech at issue is lawful and not misleading; 2) whether the asserted governmental interest is substantial; 3) whether the regulation directly advances the interest; and 4) whether it is not more extensive than necessary. 447 U.S. at 566, 100 S.Ct. at 2351.

1. the nature of the commercial speech

■ As the Illinois court observed in *Chicago v. Prus,* "there is nothing unlawful about selling a home, nor is the simple announcement of that fact misleading." 72 Ill.Dec. at 911, 453 N.E.2d at 786. Plaintiffs are individual licensed realtors and two trade associations of licensed realtors. They seek permission to post single, standard size "For Sale" signs in front of the properties they have been retained to sell. Mr. Warren testified that the signs he and other realtors use contain the name and phone number of the realty company but are otherwise standard in shape and size. Tr. at pp. 8–10. In light of these factors, the court believes that the speech at issue is both lawful and not misleading.

2. the asserted governmental interest

■ Section 230C sets out three governmental interests which may be served by an advertising ban. They are: 1) the promotion of "racial or economic stability" in the face of a "volume of real estate transactions"; 2) the prevention of "an abnormal real estate market with depressed values"; and 3) protection of the public and the "dignity and integrity of the real estate profession." In his 1980 opinion the Attorney General concluded that the second and third interests were not "substantial" enough to justify a limitation on commercial speech. 65 Op. Att'y Gen. at 74. This court agrees.

---

**17.** *But see Chicago v. Prus,* 117 Ill.App.3d 455, 72     Ill.Dec. 901, 903, 453 N.E.2d 776, 878 (1983).

Since 1980 the REC has imposed and renewed the advertising ban as a means to advance the first interest, the promotion of racial or economic stability. There is some disagreement over what this interest means in practice. Plaintiffs argue that the REC acted in an attempt to racially and economically stabilize neighborhoods and not to promote integration. In essence, they argue that the REC bowed to community pressure to "freeze" the racial and economic composition of the neighborhoods. Defendants dispute plaintiffs' characterization. They assert that the REC acted to prevent panic selling and thereby to promote integration while preventing re-segregation.

In *Linmark* Justice Marshall made clear that "promoting stable, racially integrated housing" is a "vital" governmental interest. 431 U.S. at 94, 97 S.Ct. at 1619. There is overwhelming evidence that racially motivated panic selling renders "stable" integration impossible. During the 1982 and 1983 hearings the REC heard testimony about blockbusting and steering, two practices which cause panic selling and impede orderly integration. The witnesses discussing steering believed that practice was occurring in their communities at the time and was not merely an historical phenomenon. The court believes there is ample evidence that the REC acted, at least in part, to prevent panic selling and thereby to promote stable integration.

Plaintiffs rely heavily on the deposition testimony of Commissioner Jones for their argument that the REC imposed and renewed the advertising ban solely as a means to economically stabilize communities without regard for their racial composition. The court recognizes that Commissioner Jones was fairly adamant in his assertion that racial composition had nothing to do with the RECA designations. The court believes, however, that the testimony and documentary evidence presented to the REC in 1982 and 1983 and the evidence received by this court all indicate that the requesting communities were quite concerned with integration. Many witnesses discussed the value of life in an integrated community and voiced their support for continued integration. This testimony provided at least one basis for the REC's action. The court rejects the notion that the REC acted *solely* to bring economic stabilization to the requesting communities. Commissioner Jones' testimony provides the only support for such an interpretation. The rest of the evidence, in contrast, supports the defendants' position.

3. direct advancement of the asserted interest

■ Plaintiffs do not dispute that predatory real estate practices such as blockbusting and steering cause, or at least contribute to, panic selling. By definition, panic selling impedes stable integration. In the court's view, therefore, measures which inhibit panic selling directly advance the goal of stable integration.

Plaintiffs correctly assert that the analysis required in this case goes beyond the straightforward principles just discussed. They argue that panic selling does not exist anywhere in Baltimore City today, either in or outside of the RECAs. They conclude that any regulation aimed at stopping panic selling is, therefore, unnecessary. Defendants respond that panic selling is a real possibility in the RECAs in the absence of a sign ban.

In order to resolve this dispute it is necessary to analyze separately the two identified causes of panic selling, blockbusting and steering. The record shows that blockbusting was prevalent in northwest Baltimore and existed in northeast Baltimore in the 1960s. There is no evidence of blockbusting in any area of Baltimore today. Indeed, the evidence shows that the city as a whole and the RECAs in particular are largely stable. *See* plaintiffs' hrg. ex. 1–6. The court believes bans on the posting of signs and on other more aggressive forms of solicitation directly prevent blockbusting by taking away many of the blockbuster's tools. However, where, as here, there is no demonstration that blockbusting actual-

ly exists, the fact that a sign ban may well deter blockbusting is of little consequence.

Defendants have shown that steering exists in Baltimore today. *See* paper # 17, ex. M. Steering is a more subtle and less visible practice than blockbusting and it is not clear that a ban on signs prevents it. The posting of signs makes steering more visible, possibly encouraging panic selling. On the other hand, a ban on signs may actually encourage steering by limiting knowledge of which properties are for sale. Even if the defendants could demonstrate that a ban on signs directly advanced the state's interest in deterring steering, the court believes there is insufficient evidence of the existence of steering in individual RECAs to support the ban.

Citing Dr. Taylor's testimony, defendants have argued that the RECAs have been more successful than other Baltimore City neighborhoods in achieving integration. They attribute this success, in part, to the existence of the sign ban. In response, plaintiffs argue that the defendants have not demonstrated a sufficient nexus between the sign ban and the promotion of integration. The court agrees with the plaintiffs. The sign ban was imposed to deter blockbusting. There is no evidence that practice continues to exist. In addition, there is insufficient evidence that a sign ban actually deters steering or that steering occurs in each of the designated RECAs. On the record before it the court cannot accept defendants' assertion that the ban directly advances the goal of stable integration by preventing the occurrence of panic selling.

### 4. least restrictive alternative

Even if the defendants could show that the sign ban directly promotes stable integration, they would still have to demonstrate that a sign ban is the least restrictive policy available. In this connection the defendants argue that signs are the particular evil to be combated. They point out that community residents who testified before the REC identified the signs as the cause of their problems.

■ The court is not convinced that a sign ban is the least restrictive measure available to deter panic selling and encourage stable integration. Other Maryland statutes, specifically sections 230A, 230B and 230D of Article 56, proscribe realtor misconduct which encourages panic selling. Defendants argue that the intent requirements of those statutes render enforcement difficult. In the absence of prosecutions under those statutes, the court is not prepared to dismiss the statutes as ineffective. In addition, there are federal fair housing laws available. Proof of intent is not required to show a violation of those laws. *See* 42 U.S.C. § 3604(a), (e). The court has also heard testimony of the vitality of NECO and the other community organizations operating in the RECAs. The NECO marketing program and other voluntary agreements between realtors and the community are also tools which can be used to promote stable integration without infringing on the commercial speech rights of the plaintiffs.

Defendants have asserted that the attitudes and fears of long term residents, rather than the actual contemporary situation, are crucial in evaluating a community's susceptibility to panic selling. They base their assertion on Dr. Taylor's testimony. Because long term residents associate the appearance of "For Sale" signs with blockbusting, they argue that only a ban on those signs will be effective in preventing panic selling. The court does not doubt that the blockbusting and attendant panic selling which occurred in Baltimore in the 1960s and early 1970s made a profound impression on community residents. The court is uncomfortable, however, with the proposition that fears stemming from practices which no longer take place can justify a restriction on otherwise unobjectionable speech. The court believes a restriction imposed on that basis could conceivably remain in effect for decades. As such it might well encourage, rather than discourage, a climate of fear.

■ In conclusion, the court believes that the plaintiffs have a substantial

chance of prevailing on the merits of their first amendment arguments. While the sign ban addresses an important governmental interest, the promotion of stable integration, defendants have not demonstrated that the ban advances that interest directly or that it is the least restrictive policy available. In light of this finding, the court finds it unnecessary to address the plaintiffs' fourteenth amendment arguments at this time.

d. irreparable injury

In order to be entitled to a preliminary injunction, plaintiffs must demonstrate, *inter alia*, that they will be irreparably injured if the injunction does not issue. Plaintiffs maintain that deprivation of any constitutional right, and particularly a first amendment right, constitutes injury *per se* and that they need make no other showing of injury in order to meet their burden. *Elrod v. Burns*, 427 U.S. 347, 374, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); 11 C. Wright & A. Miller, *Federal Practice and Procedure* (1973) § 2948.

Defendants maintain that, while loss of traditional first amendment rights constitutes irreparable injury, *see Johnson v. Bergland*, 586 F.2d 993, 925 (4th Cir.1978), loss of commercial speech rights does not. They base this argument on the lesser degree of first amendment protection accorded to commercial speech.

There appears to be no reported case in which a party has requested a preliminary injunction on the basis that his first amendment commercial speech rights are being violated. All of the cases involving other constitutional rights which the court has examined follow the rule outlined by plaintiffs. *See e.g., Planned Parenthood v. Citizens for Community Action*, 558 F.2d 861, 866–67 (7th Cir.1977) (court finds irreparable injury where civil ordinance placing moratorium on building of abortion facilities interfered with constitutional rights); *Jessen v. Village of Lyndon Station*, 519 F.Supp. 1183, 1189 (W.D.Wis.1981) (court finds irreparable injury where plaintiff stands to lose a property right without due process); *McGinnis v. U.S. Postal Service*, 512 F.Supp. 517, 525 (N.D.Cal.1980) (court finds irreparable injury where first amendment freedom of religion threatened); *Electronic Data Systems, etc. v. Social Security Administration*, 508 F.Supp. 1350, 1356 (N.D.Tx.1981) (allegation of deprivation of due process rights sufficient to sustain a finding of irreparable injury); *O'Connor v. Mowbray*, 504 F.Supp. 139, 141 (D.Nev.1980) (denial of effective access to courts constitutes irreparable injury); *Central Alabama Paving, Inc. v. James*, 499 F.Supp. 629 (M.D.Ala.1980) (deprivation of equal protection sufficient to sustain finding of irreparable injury).

■ In the absence of any case directly supporting defendants' argument, the court will follow the majority rule and hold that if plaintiffs are able to demonstrate a loss of constitutional rights, they will have met the irreparable injury requirement. This approach is entirely consistent with the rationale underlying the Supreme Court's commercial speech opinions. Commercial speech is afforded less first amendment protection than traditional political or religious speech because it is hardier and more objective and because it is less valuable to society. *See Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 771–72, n. 24, 96 S.Ct. 1817, 1830–31 n. 24, 48 L.Ed.2d 346. The lesser degree of protection does not stem from its lack of value to the speaker. It is sensible, therefore, to say that the speaker is irreparably injured once he is able to show, *under the standards governing commercial speech*, that his constitutional rights have been violated.

In light of its finding that the plaintiffs have demonstrated likelihood of success on the merits of their first amendment arguments, the court believes also that the plaintiffs have met the irreparable injury prong of the Fourth Circuit's test for preliminary injunctive relief.

■ Defendants assert that they will be irreparably injured if the court grants the preliminary relief plaintiffs seek. They as-

sert, and the court agrees, that their interests are more properly characterized as the public interest, the fourth factor to be considered in granting or denying injunctive relief.

Defendants believe that panic selling will recur in the RECAs if the court lifts the sign ban. They assert that the panic will irreparably damage the affected neighborhoods by encouraging resegregation. They draw the court's attention to the subjective and objective evidence submitted at the hearing of resegregation's negative effects on a community and on the city as a whole.

Plaintiffs respond that defendants' fears are unfounded. They again point out that defendants were unable to show that panic selling currently is taking place anywhere in Baltimore. They also argue that the temporary lifting of the ban in 1983 did not cause panic selling. They acknowledge that some realtors continued to voluntarily comply with the ban during the 1983 hiatus. They believe, however, that those realtors who chose not to comply voluntarily did post signs and that the presence of those signs did not spark a panic.

The court must agree with the plaintiffs. There is not sufficient evidence that panic selling will occur in the absence of a sign ban to indicate its retention is in the public interest. The court believes the record shows that Baltimore City in general and the RECA communities in particular have progressed far beyond the fears which characterized the 1960s. These communities are too strong and vibrant to hide behind a regulation which deliberately seeks to limit knowledge about an important event in the community, the sale of a home.

In conclusion, for the reasons stated in the foregoing memorandum, it is this 29th day of October 1984, by the United States District Court for the District of Maryland,

ORDERED

(1) that plaintiffs' motion for preliminary injunction be, and the same hereby is, *Granted;* and

(2) that the Clerk of the Court mail copies of this Memorandum and Order to the parties.